UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Crim No. 13-CR-10292-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| ROBERT BURTON | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM

The government submits this memorandum in advance of the sentencing hearing in this matter, which is currently scheduled for December 22. As the Court is aware, the parties entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11 (c)(1), pursuant to which they agreed that the defendant would, among other things, make certain restitution payments to the victims at or before sentencing and the government would recommend no more than 24 months in prison. The defendant, however, has not made any restitution payments and, if he fails to do so, will be in breach of the agreement. Although defense counsel has assured the government that the defendant hopes to make those payments, as set forth in his recent Motion for Reconsideration of Detention Order, Dkt. No. 109, the defendant has yet to amass the amount required and has yet to make any portion of the minimum payment contemplated by the plea agreement. Unless and until the defendant makes the restitution payment, the government is not in a position to assess his compliance with the terms of the agreement.

If the defendant complies with his obligations under the agreement, the government intends to recommend a sentence of 24 months in prison, to be followed by a term of three years supervised release, restitution in the amount of $159,500 to the victims (with a minimum of $50,000 paid at or before sentencing and 25% of future earnings paid thereafter), restitution of $278,132 to the Internal Revenue Service, a fine of $7,500 and a special assessment of $1,100. If the defendant does not comply with the terms of the plea agreement, the government will reassess its recommendation and advise the Court of the same. Under any circumstance, the government recommends that the Court impose a sentence to include a term of incarceration.

## BACKGROUND

### I. The Charges

On August 21, 2014, pursuant to a plea agreement, Robert Burton pleaded guilty to all 11 counts of the above-captioned Second Superseding Indictment, charging him with five counts of securities fraud, in violation of in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; two counts of procuring false tax returns, in violation of 26 U.S.C. § 7206(2); and four counts of subscribing false tax returns, in violation of 26 U.S.C. § 7206(1). As set forth further below, Burton ran a financial services business, originally located in Boston and later located at various offices in Lawrence. Although he changed the name, the business generally was called "Pinnacle" and provided tax preparation, investment advisory, loan modification, debt consolidation and bankruptcy petition preparation services.

The charges fall into three categories: (1) fraud charges based on his misappropriation of funds invested with him; (2) tax charges based on his preparation of false returns for two of his

clients; and (3) tax charges based on his preparation and filing of his own false returns.

**II.     Facts**

**A.** <u>Overview of Pinnacle and the Legal Actions Against Burton</u>

Burton owned and operated a financial services company that went by various different names, including Pinnacle Financial Consulting, LLC, Pinnacle Strategic Investments, LLC, Pinnacle Asset and Capital Management, LLC, Pinnacle Financial and Legal Solutions, LLC, Pinnacle Management Group, LLC and Pinnacle Holdings, LLC (collectively, "Pinnacle"). Burton, through Pinnacle, offered various financial services, including tax preparation, investment advising, loan modification, debt consolidation and bankruptcy petition preparation. For the most part, Burton did the tax preparation and investment advising himself, but over time he also had between 8 and 10 employees who assisted with the loan modification, debt consolidation, bankruptcy petition preparation and some tax preparation.

In addition to this criminal case, the Attorney General for the Commonwealth of Massachusetts filed suit, and obtained an injunction, based primarily on Burton's improper collection of up-front fees in connection with the loan modification process. The March 2013 injunction also prevented him from advertising, receiving fees and/or providing bankruptcy petition preparation, legal advice, or investment advisory services. Likewise, Burton was sued in bankruptcy court for the unauthorized practice of law in connection with his bankruptcy petition preparation services. Although Burton is a graduate of the Massachusetts School of Law, he has never been admitted to any bar. Thus, after holding a five day bench trial, and hearing testimony from Burton and several Pinnacle employees, Judge Boroff of the U.S. Bankruptcy Court issued

a 101-page decision in which he found that Burton had engaged in the unauthorized practice of law and ordered that he disgorge fees charged to his bankruptcy petition preparation clients. Judge Boroff also found that Burton's testimony was not credible.

Bank account analysis also demonstrates that, while Burton did provide some services to his clients, he took advantage of them in many ways. Indeed, clients seeking assistance with loan modification necessarily are in financial distress. Many clients have told various investigators that Burton charged fees for assistance with loan modification, appeared to perform very little in the way of services, and then essentially talked them into filing for bankruptcy and charged additional fees for those services. Likewise, Burton's tax preparation was shoddy at best and, in some instances, criminal. Indeed, the IRS began civil audits of a sampling of Burton's clients and found major errors in virtually every tax return in the sample. Burton then charged his clients additional fees for assistance with the IRS audit. This audit process is what led to the IRS's criminal investigation and the criminal tax charges to which Burton has now pleaded guilty.

**B.** Fraudulent Conduct

1. Scheme to Defraud Investors: Counts One through Five

According to Burton's employees, Burton's investment advisory services were not the primary focus of his business. Indeed, it appears that the "investment advising" was something that Burton did himself and it was a much smaller portion of his business. That being said, he provided investment clients with documents on Pinnacle letterhead and deposited their money into Pinnacle bank accounts.

*A.C. and L.C.*

A.C., who invested with Burton in 2007, and L.C. and L.C.'s wife, M.C., who invested with Burton in 2011 and 2012, all viewed him as their investment advisor and believed that he was actually "managing" their money. A.C. is a chaplain in the army and L.C. is a pilot for a commercial airline.

When A.C. met with Burton in early 2007, Burton described himself as a financial advisor at Deutsche Bank (which was not true – while he did work at Deutsche at one point, he worked in an administrative role) and offered to provide investment advising services to A.C.. Burton told A.C. that he would open an Individual Retirement Account with A.C.'s $25,000, which, on Burton's direction, A.C. gave to Burton in cash. Burton specifically told A.C. that he would invest A.C.'s money in index funds and a diversified equities portfolio and provided A.C. with written and oral updates showing what stocks A.C. was allegedly invested in. Burton also charged A.C. a fee of $2,500 for the investment advising services.

For example, in July 2007, approximately 6 months after A.C.'s investment, Burton gave

A.C. a document—on Pinnacle Asset and Capital Management stationary—purporting to detail his account holdings. That same document attached a print out from CNNMoney purporting to show the specific securities in which A.C.'s money is invested. Likewise, in November 2011, Burton gave A.C. the log-in credentials to a web-site that allowed A.C. to view his account holdings. Analysis of Burton's bank account establishes that A.C.'s money was not invested in any of the securities identified in the July 2007 document, or any securities at all. Rather, it was simply spent as soon as it was deposited.

L.C. and M.C. also retained Burton as their investment advisor and also paid Burton for his investment advising services. Indeed, at one point, Burton actually prepared an investment "plan" for them. L.C. and M.C. initially came to Burton for assistance with a loan modification and later retained him for tax preparation and investment advising services. At Burton's direction, in 2011, L.C. and M.C. withdrew a total of $98,000 from L.C.'s IRA and used some of it to pay down their mortgage (which Burton was unable to modify) and gave Burton another $40,000 for investment in "private equity." In May 2012, L.C. and M.C. gave Burton another $35,000 for investment after Burton assured them that their investments were doing well.

As with A.C., Burton provided L.C. and M.C. with access to a web-site that showed their purported holdings in the "funds" identified in the indictment. An April 2013 print-out from the web-site showed an account balance of $107,000 (suggesting that L.C.'s and M.C.'s $70,000 investment had appreciated) and also showed that their funds were maintained in specific funds—Pinnacle Strategic Investments Ram 2100 Fund, the U.S. Currency Fund and the Pinnacle Debt Portfolio 2020. But L.C.'s and M.C.'s funds were never invested in anything.

Once again, Burton spent L.C.'s and M.C.'s money as soon as it was deposited into his accounts.

*S.H. and E.V.*

S.H., Burton's neighbor, and E.V., a tax client and friend, both made investments with Burton pursuant to Pinnacle Strategic Investments, LLC offering memoranda and promissory notes, which were signed by Burton. As set forth in the documents provided to both S.H. and E.V., Burton represented that their money ($40,000 for S.H. and $25,000 for E.V.) was to be invested in a "debt portfolio." In the promissory notes and offering memoranda, Burton also promised that S.H.'s and E.V.'s investments would be repaid, along with 100% interest, within 30 days. Indeed, prior to his investment, Burton solicited S.H. mercilessly via text message and, among other things, told S.H. that he would personally "guarantee" the investment. Also prior to investing, S.H. submitted a series of written questions, to which Burton responded. In his written responses, Burton again promised that S.H.'s investment, plus interest, would be returned within 30 days.

Burton did not return any money to either S.H. or E.V. within 30 days. Then, after the 30 day window had passed, Burton gave each of them a series of checks that bounced. E.V. later learned that the bank account on which the bounced checks were drawn was closed before Burton even gave him the checks. Moreover, according to bank records, Burton did not invest any of S.H.'s or E.V.'s money. Rather, their money was simply withdrawn from the account into which Burton deposited it.

7

2. Tax Charges

As set forth above, the tax charges fall into two categories—charges based on Burton's preparation of false returns for two of his clients, L.C. and his wife M.C. and R.T. and R.T'.'s wife B.T., as well as the filing of his own false returns for four years.

*Procuring False Tax Returns*

R.T. and B.T. retained Burton to prepare their 2008 personal tax return. R.T. and B.T. were relatively wealthy clients for Burton, in that they owned their own business—Premier Abatement and Labor Services. Because Premier Abatement was an S Corporation, all income from the corporation flowed through to R.T. and B.T. and taxes were required to be paid on R.T.'s and B.T.'s personal tax return. In preparing that return, however, Burton did not report any of the more than $300,000 in income that R.T. and B.T. received from Premier Abatement. R.T. and B.T. and their in-house accountant provided Burton with all of the information related to Premier Abatement's income, and indeed much of it is documented in e-mail traffic between Burton and the in-house accountant. The in-house accountant even questioned Burton's methodology and called the IRS herself to ask questions about how certain information should be reported. When she pushed back with Burton, Burton sent her an e-mail telling her that he was in the business of saving them money and that he knew better than a government bureaucrat when it came to preparing taxes.[1]

---

[1] Among other things, Burton also prepared Premier Abatement's Form 1120S, which is an informational return that identifies the business income. The Form 1120S must be filed before the personal tax return since the income flows through to the personal return. Burton, however, did it in reverse—filing R.T.'s and B.T.'s personal return before the Form 1120S and it was therefore impossible for him to report the income accurately. Indeed, R.T.'s and B.T.'s in-house accountant identified that issue for Burton and Burton told her that he knew better than she did on the matter.

When the IRS commenced its audit of R.T.'s and B.T.'s return, Burton then filed two amended returns on their behalf. R.T. and B.T., however, did not know about the amendments and never signed them. The signatures on the amended returns are forged.

As set forth above, L.C. and M.C. retained Burton to prepare their 2011 tax return, the same year that Burton helped them with their loan modification and "invested" on their behalf. Burton was aware that they had received a $98,000 distribution from L.C.'s IRA in 2011 and indeed had done that at Burton's direction in order to (1) make some mortgage payments while the loan modification process was ongoing and (2) invest with Burton. In fact, Burton—playing the role of "investment advisor"—actually participated in recorded calls with Fidelity in which L.C. requested the withdrawal. Burton nonetheless omitted the $98,000 distribution from their tax return.

*Subscribing False Tax Returns*

Burton prepared and filed his own tax returns for the 2008 through 2011 tax years and failed to report huge portions of the gross receipts/income that he received from Pinnacle. Pinnacle, as a Limited Liability Corporation, was not required to pay taxes on income, but rather, as with R.T. and B.T., the income should have flowed through to Burton and been reported on Burton's personal return. For the 2010 and 2011 tax years, Burton also falsely claimed two dependents—his nephews—neither of whom were living with him during 2010 or 2011. By failing to report all of Pinnacle's gross receipts (as required on Schedule C to the tax return), and falsely reporting two dependents, Burton avoided paying approximately $150,000 in taxes during that same time frame. Indeed, by under-reporting his income, and claiming the two dependents,

Burton was allowed to claim the earned income tax credit which is intended to ease the tax burden imposed on low income tax payers.

After being interviewed by Special Agents from IRS-Criminal Investigation, Burton filed amended tax returns for 2010 and 2011, both of which included corrected income figures. Burton also removed the dependents from those returns and no longer claimed the earned income tax credit. Burton did not amend his returns for 2008 and 2009, nor did he pay the taxes due and owing for tax years 2010 and 2011.

## THE PLEA AGREEMENT AND POST-PLEA CONDUCT

### I. The Plea Agreement

In August 2014, the parties entered into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). Pursuant to that plea agreement the parties jointly agreed to take the position that Burton's total adjusted offense level under the Sentencing Guidelines is 20, which includes a three level downward adjustment for acceptance of responsibility. The parties further agreed that, based on the information then available, a reasonable and appropriate disposition of the case is as follows:

(a) Incarceration or other confinement for a period of between 12 months and 24 months;

(b) a fine of $7,500;

(c) 36 months supervised release;

(d) a mandatory special assessment of $1,100;

(e) restitution of $159, 500, with at least $50,000 to $100,000 to be paid at or before sentencing, and 25% of future earnings to be paid thereafter until the restitution obligation is satisfied in full; and

(f)  forfeiture.

The parties further agreed to jointly recommend that the Court order restitution to the Internal Revenue Service in an amount of $278,132.

A critical component of the agreement, from the government's perspective, was the restitution payment.  Each of Burton's victims is desperate for him to repay the amounts stolen and, in light of Burton's willingness to make payments above and beyond what he may have been required to pay as part of a mandatory restitution order, the government was willing to make other concessions in the plea agreement.

## II. Post-Plea Conduct

On September 30, 2014, the day that the defendant was due in bankruptcy court to address his non-compliance with Jude Boroff's Order requiring that Burton make disgorgement payments to certain of his bankruptcy clients ("May 2013 Order"), the defendant also failed to comply with his Court-imposed curfew.  Specifically, Burton, who wore an electronic monitoring device, failed to return home by midnight, as required.  Having been alerted through the electronic monitoring system, the Pre-Trial Services Officer attempted to contact Burton and also contacted his third-party custodian who was unaware of Burton's whereabouts.   At that point, a warrant was issued for Burton's arrest.  When Burton eventually did make contact with the Pre-Trial Services Officer that night, Burton initially attempted to mislead the Officer, claiming that he had fallen asleep on his own couch at home.  Only after further inquiry from the Officer did Burton admit that he had been at a friend's house.

Later that day, and before the warrant had been executed, Burton appeared in bankruptcy court. Judge Boroff found Burton, who had failed to make any of the payments required by the May 2013 Order, in contempt of court and ordered him detained. The next day, Burton appeared before Chief Magistrate Judge Boal for a detention hearing in this case and, two days later, Chief Magistrate Judge Boal issued an Order of Detention. Among other things, the Detention Order noted the defendant's history of non-compliance with his conditions of release and his repeated efforts to mislead Pre-Trial Services.

On November 19, 2014, Judge Boroff lifted the bankruptcy court's detention order and scheduled a further hearing on civil contempt of his May 2013 Order for January 2015. In lifting the detention order in that case, Judge Boroff noted that "the payments set forth in this Court's May 29, 2013 Judgment and Orders have still not been made."

Since Burton's detention on September 30, 2014, the parties have been in discussions regarding the state of the plea agreement and Burton's ability to comply with his obligations thereunder, in particular the restitution obligation. It is clear that Burton will not make more than the minimum $50,000 payment and it is not clear, at least to the government, whether he will even make that minimum payment, as required, on or before December 22. Most recently, in his Motion for Reconsideration of Detention Order, Dkt. No. 109, Burton claims that he has amassed $27,000 but he further claims that it will be impossible for him to raise the full $50,000 unless he is released from custody prior to sentencing.

**THE PRE-SENTENCE REPORT AND THE SENTENCING GUIDELINES**

    **I.**        **Sentencing Guidelines**

On October 8, 2014, the Probation Office issued its draft Pre-Sentence Report ("PSR"). According to the draft PSR, the Probation Office agrees with the parties that, after considering both the securities fraud (Group 1) and tax (Group 2) offenses, and applying an additional two levels under grouping principles, Burton's Combined Total Adjusted Offense level, prior to any reduction for acceptance of responsibility, is 23. There is no discrepancy between the plea agreement and the Probation Office's calculation of the securities fraud guidelines although the Probation Office applies one additional adjustment to the tax guidelines, which adjustment was not included in the plea agreement. That said, after review of the draft PSR, the government agrees with the Probation Office's calculations, which, as set forth above, result in the same Combined Adjusted Offense level as that calculated in the plea agreement. Specifically, the government agrees that the following Sentencing Guidelines apply:

Group 1:  Securities Fraud

| | |
|---|---:|
| Base offense level (USSG §2B1.1(a)(1)) | +7 |
| Loss of more than $120,000 but less than $200,000 (USSG §2B1.1 (b)(1)(F)) | +10 |
| Defendant was an investment advisor at the time he violated a securities law (USSG §2B1.1(b)(19)(A)(iii)) | +4 |
| Adjusted offense level | 21 |

<u>Group 2: Tax Offenses</u>

Tax loss of $271,640 (USSG §2T1.4(a)(1))                                              +18

Defendant was in the business of preparing tax returns (USSG §2T1.4(b)(1)(B))   +2

Adjusted offense level                                                                          20

<u>Multiple Count Adjustment</u>

Securities Fraud - 1 unit

Tax offenses – 1 unit

Total Number of units – 2                                                                       +2

<u>Combined Adjusted Offense Level</u>                                                          23

Acceptance of responsibility (USSG §3E1.1)                                            -3

<u>Total Offense Level</u>                                                                              20

## II.  Criminal History

The plea agreement is silent as to Burton's criminal history.  The PSR calculates Burton's criminal history to be a level II because the instant offense were committed while he was under supervision for Operating Under the Influence in 2010, which supervision was not completed until 2012.

**SENTENCING RECOMMENDATION**

As set forth above, the government is not in a position to make its final sentencing recommendation because the defendant has yet to comply with his obligations under the plea agreement.  Accordingly, the government will supplement this submission in advance of sentencing.  The following is a discussion of why, at the time it entered into the plea agreement

in August 2014—before the defendant had violated his conditions of release and at a time when it seemed clear that the defendant would go above and beyond his obligations to make his victims whole—the government was prepared to recommend a sentence of 24 months in prison, which represents a variance from the Guidelines.

As an initial matter, the defendant's criminal history category of II, which establishes a Guidelines Sentencing Range ("GSR") of 37-46 months in prison, as opposed to 33-41 months in prison, arguably overstates his culpability here. Although the Probation Office is correct in calculating the defendant's criminal history, the two crimes—an OUI and fraud offenses—are totally unrelated and the only reason that the defendant receives additional criminal history points is because he was still completing his supervision on the OUI at the time he committed the instant offenses. Regardless of the defendant's conduct under the plea agreement, in fashioning a sentence that is sufficient but no greater than necessary to reflect the seriousness of the crime, provide just punishment, and provide adequate deterrence, the government respectfully submits that the Court may consider that the criminal history slightly overstates the defendant's culpability here.

In addition, if Burton lives up to his promise to attempt to make his victims whole earlier than required by any restitution order, not just by making a substantial payment initially but also by agreeing to pay 25% of future earnings, it would be appropriate to vary downward and sentence him to 24 months in prison. This is a serious offense and it warrants a term of incarceration. The victims in this case, each of whom lost between $25,000 and $75,000, need their money back. In order to provide just punishment for this crime, the sentence must reflect

the fact that the defendant stole from friends and neighbors and stole from people who, he knew, could not afford to lose their money. If the defendant makes additional efforts to make his victims whole, a sentence of 24 months in prison would provide just punishment.

Likewise, a 24 month sentence for a defendant who, until this case, had not spent a day in prison, provides both specific and general deterrence. In terms of the latter, a 24 month sentence sends a strong message to those in the financial industry, people generally with no or relatively minor criminal history, that committing what might seem like a relatively small fraud will result in incarceration for a period of years. A 24 month sentence, imposed in conjunction with significant "up front" restitution payments to the victims, will send a strong deterrent message. In terms of specific deterrence, a 24 month sentence will remove the defendant from the business world for some time. It is worth noting that, through the efforts of other authorities, including the Massachusetts Attorney General and the U.S. Bankruptcy Trustee, and the related ongoing court orders in those cases, the defendant is no longer in business and is unlikely to ever return to the financial services industry. To the extent that the civil actions alone would not deter the defendant, a prison term coupled with his felony conviction should assure that he stays out of the financial industry for good. It is not clear that the defendant is in need of any services in prison, but if he did, again, a prison term of at least 24 months would give him time to receive any necessary vocational or other training so that he can rejoin society.

As set forth above, however, the government's arguments here apply if, and only if, the defendant lives up to the promises he made to the government, and to his victims, in August. It is obvious that the circumstances have changed significantly since the government entered into

the binding plea agreement. That said, the victims need their money back and they need it as soon as possible. For that reason, if the defendant fulfills at least the bare minimum in terms of his restitution obligations, the government will support the imposition of the 24 month sentence contemplated in the agreement. If the defendant flouts his obligations under the agreement in the same way he has ignored his obligations to the Bankruptcy Court and the release conditions imposed by Chief Magistrate Judge Boal, these arguments do not apply with such force and the government will reassess its sentencing recommendation.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of incarceration. The government will supplement this submission when it becomes clear whether the defendant will comply with his obligations under the plea agreement.

Respectfully submitted,

CARMEN M. ORTIZ

By:   */s/ Sarah E. Walters*
Sarah E. Walters
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: December 8, 2014

*/s/ Sarah E. Walters*
SARAH E. WALTERS