UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
          Plaintiff,                )
                                    )   Criminal Action
v.                                  )   No. 13-10292-MLW
                                    )
ROBERT BURTON,                      )
                                    )
          Defendant.                )
                                    )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


SENTENCING

December 22, 2014
3:12 p.m.



John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
           UNITED STATES ATTORNEY'S OFFICE
 3         By:  AUSA Sarah E. Walters
           One Courthouse Way, Suite 9200
 4         Boston, Massachusetts 02210
           617.748.3130
 5         sarah.walters@usdoj.gov

 6    On Behalf of the Defendant:
           FEDERAL DEFENDER OFFICE
 7         By:  Oscar Cruz, Jr., Esq.
           51 Sleeper Street
 8         Boston, Massachusetts 02210
           617.223.8061
 9         oscar_cruz@fd.org

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S
 2           THE COURT:  Would counsel identify yourselves for the
 3    record, please.
 4           MS. WALTERS:  Good afternoon, Your Honor.  Sarah
 5    Walters on behalf of the United States.
 6           MR. CRUZ:  Good afternoon, Your Honor.  Oscar Cruz for
 7    Robert Burton.
 8           THE COURT:  Mr. Burton is present.  Ms. Walters, there
 9    are victims in this case.  Have they been informed of this
10    proceeding and their right to be heard if they wish to speak
11    briefly?
12           MS. WALTERS:  They have, Your Honor.  Two of them are
13    present here today and would like to address the Court.
14           THE COURT:  Okay.  Not yet.  After the -- assuming we
15    get to the point where the guideline range has been calculated,
16    before counsel argue the appropriate sentence, I'll give the
17    victims an opportunity to speak from the podium.  Okay?
18           In connection with the sentencing I have the plea
19    agreement, the Presentence Report as to which there are no
20    objections, the government's sentencing memo, the government's
21    supplemental sentencing memo, one victim impact statement dated
22    December 22, 2014 with redactions, the government's forfeiture
23    motion and proposed order and the defendant's sentencing memo.
24           Is there anything else I should have received and
25    read?
```

1              MS. WALTERS:  Nothing from the government, Your Honor.

2              MR. CRUZ:  Nothing for the defendant, Your Honor.

3              THE COURT:  Let me see if I understand -- let me see

4    if we have a clear and common sense of the posture of this

5    matter.  On August 21, 2014, the defendant pled guilty pursuant

6    to a binding Rule 11(c)(1)(C) plea agreement providing, if it

7    were accepted, for 12 to 24 months in prison on the 11 counts

8    to which the defendant pled guilty.

9              I accepted at the August 21 hearing the guilty plea

10   and deferred until the sentencing hearing, today, the decision

11   whether to accept the plea agreement and impose a sentence in

12   the agreed upon range; or, as I said, if I reject the plea

13   agreement, I would give the defendant an opportunity to

14   withdraw his plea.

15             The government's supplemental sentencing memo filed on

16   December 18 reports that the defendant breached his plea

17   agreement by failing to make restitution of at least $50,000

18   prior to sentencing as required by Section 5(e) of the

19   agreement and also by violating the conditions of his pretrial

20   release -- presentencing release and having his release

21   revoked, which itself was a violation of paragraph 4(g).

22             Drawing your attention to paragraphs 13 and 14 of the

23   binding plea agreement, paragraph 14 says, in effect, that the

24   government may decide to exercise its discretion to be released

25   from its obligations under the plea agreement as a result of

1    the violation of conditions of pretrial release.  Paragraph 13

2    provides, in effect, that the government can declare the plea

3    agreement null and void if the Court rejects the plea

4    agreement.

5         The government has informed the defendant in writing

6    of its intention to exercise its option to be released of its

7    commitments under paragraph 14 and asks that the Court reject

8    the plea agreement so the government's declaration that it's

9    null and void will become effective, and the government

10   recommends that I conduct the colloquy required by Rule

11   11(c)(5) when a binding plea agreement is rejected and, among

12   other things, give the defendant a chance to withdraw his plea.

13        The government understands that the defendant does not

14   want to withdraw his plea, even if the plea agreement is

15   rejected, and indeed that's what the defendant's sentencing

16   memo says.  Rather I'm told the defendant would like the guilty

17   plea to stand.  And the parties will argue what sentence is

18   sufficient and no more than necessary in all the present

19   circumstances of the case.

20        Have I accurately and completely described the posture

21   of this matter?

22        MS. WALTERS:  Absolutely, Your Honor.

23        MR. CRUZ:  Yes, for the defendant you have, Your

24   Honor.

25        THE COURT:  All right.  Then I'm going to ask the

1      deputy clerk -- I'm going to ask the defendant to stand and be

2      sworn, and I will ask him the questions required by Rule

3      11(c)(5) because based on all the information I have, I hereby

4      do reject the binding plea agreement as I would have done even

5      if there was not an agreement on this issue, given the

6      evolution of events since the guilty plea.

7              (Defendant Robert Burton duly sworn.)

8              THE COURT:  Would you please state your true full

9      name.

10             THE DEFENDANT:  Robert Burton.

11             THE COURT:  Mr. Burton, do you understand that you've

12     just taken an oath to answer the questions I'm about to ask

13     truthfully and any failure to do that could be a separate

14     prosecutable criminal offense?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  In addition, do you understand if you're

17     confused by any of my questions or unsure about what an honest

18     and accurate answer would be, I'll let you speak to Mr. Cruz so

19     we can clear up any confusion and you can give me a reliable

20     response?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  All right.  Do you understand that I have

23     just rejected the binding plea agreement which provided that if

24     I accepted it, I would have to sentence you to 12 to 24 months

25     in prison?

1           THE DEFENDANT:  Yes, Your Honor.

2           THE COURT:  And do you understand that as a result of

3    my rejecting that, I don't have to follow the plea agreement

4    and I can give you any sentence actually up to the statutory

5    maximum but in any event a sentence much higher than the

6    24-month ceiling in the binding plea agreement?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  And do you understand that you have in

9    these circumstances a right to withdraw your guilty plea and

10   have a trial on the charges against you if you want one?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Do you understand that if your guilty plea

13   is not withdrawn, I may give you a sentence higher and indeed

14   much higher than the 12-month minimum or 24-month maximum in

15   the binding plea agreement?

16          THE DEFENDANT:  I do, Your Honor.

17          THE COURT:  And have you talked with your attorney,

18   Mr. Cruz, about whether you want to -- well, about all these

19   things that I just explained to you?

20          THE DEFENDANT:  I have, Your Honor.

21          THE COURT:  And have you particularly talked with him

22   about whether you want to withdraw your plea?

23          THE DEFENDANT:  Yes, I have, Your Honor.

24          THE COURT:  Are you fully satisfied with his work as

25   your lawyer?

1            THE DEFENDANT:  I am, Your Honor.

2            THE COURT:  Do you wish to withdraw your plea?

3            THE DEFENDANT:  No, Your Honor.

4            THE COURT:  And therefore, you understand that the

5      sentencing will proceed as if you pleaded guilty, but I have

6      all the discretion I would ordinarily have at sentencing and am

7      not bound by the 12 to 24-month sentence described in the plea

8      agreement?

9            THE DEFENDANT:  Yes, Your Honor.

10            THE COURT:  Okay.  Well, I'm satisfied that Mr. Burton

11      is competent, he's acting knowingly and voluntarily, he's

12      effectively represented; and in addition to all the findings I

13      made at the Rule 11 hearing, I find that he has once again

14      knowingly and voluntarily waived his right to trial, and we

15      will proceed to the sentencing.

16            All right.  Let's see.  As always, I try to assure we

17      have a clear and common sense of the legal framework.  It's as

18      stated by the Supreme Court in *Gall*.  I have to begin by

19      correctly calculating the applicable guideline range.  The

20      guidelines are the starting point and initial benchmark.  They

21      may not, however, be presumed -- the guideline range may not be

22      presumed to be a reasonable range.  Rather I have to consider

23      all the Section 3553(a) factors and decide what sentence is

24      sufficient and no more than necessary in this particular case.

25      If there's going to be a departure or variance, a major

1    departure or various requires a more significant justification

2    than a minor one, and, in any event, I have to explain my

3    reasoning.

4              Do the parties agree?

5              MR. CRUZ:  Yes, Your Honor.

6              MS. WALTERS:  Yes, Your Honor.

7              THE COURT:  I believe we're operating under the

8    guidelines now in effect with the amendments effective November

9    1, 2014.  Is that right?

10             PROBATION:  Yes, Your Honor.

11             THE COURT:  Okay.  Do the parties agree with that?

12             MS. WALTERS:  Yes, Your Honor.

13             MR. CRUZ:  Yes, Your Honor.

14             THE COURT:  Mr. Cruz, have you and Mr. Burton each

15   read the Presentence Report?

16             MR. CRUZ:  We have.

17             THE COURT:  Is there anything in there that you or he

18   thinks is inaccurate?

19             MR. CRUZ:  No, Your Honor.

20             THE COURT:  And Mr. Burton, did you read the

21   Presentence Report?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  Is there anything in there that you think

24   is inaccurate?

25             THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Okay.  All right.  The factual statements

2     in the Presentence Report therefore are hereby accepted.

3          I want to clarify one thing before I calculate the

4     guideline range.  In paragraph 319, the defendant is given a

5     downward adjustment for acceptance of responsibility.  I

6     haven't received any request to deny that adjustment.  Is that

7     correct?

8          MS. WALTERS:  That's right, Your Honor.

9          THE COURT:  All right.  Then, as I understand it, the

10    total offense level is 20, Criminal History Category is II.

11    This is as stated on page 26 of the Presentence Report.  The

12    guideline range is 37 to 46 months in custody, 12 to 36 months

13    supervised release, $7,500 to $25 million as a fine, $159,500

14    as restitution and a mandatory $1100 special assessment.

15          Do the parties agree that those are the guideline

16    ranges?

17          MS. WALTERS:  Yes, Your Honor.

18          MR. CRUZ:  Yes, Your Honor.

19          THE COURT:  Then I think this would be an appropriate

20    time to hear from the victims.  They should come up one at a

21    time to that podium, state their name and address me.

22          MR. HANNAN:  Your Honor, my name is Sean Hannan.  I am

23    the neighbor to Mr. Burton.  I have a few things I'd like to

24    say.  First of all, thank you for letting me speak.  This is

25    the first chance I've had to actually tell someone how

```
 1    Mr. Burton has impacted me.
 2            First of all, right after was a lot of stress, and my
 3    health took a bit of a beating.  I saw the doctor a few times.
 4    I had ulcers.
 5            THE COURT:  Could you take a step back, please?
 6            MR. HANNAN:  Take a step back?
 7            THE COURT:  No.  I'm going to take a step back.
 8    You're standing in the right place.  I want to ask you a
 9    question before you tell me about the impact on you.  What do
10    you do professionally?
11            MR. HANNAN:  I'm a cameraman.  I've been in the movie
12    business for 20 -- about 20 years.
13            THE COURT:  All right.  And what was your relationship
14    financially with Mr. Burton?
15            MR. HANNAN:  Financially, well, he did my taxes for a
16    few years, and I guess he saw what I have in the bank that I
17    saved.  It took me a long, long time to save that money.  And I
18    used to take vacations.  But financially connected with him,
19    just taxes and -- you know, I'd go over his house.  He came
20    over my house.  From my bedroom window, I can see his house.
21            THE COURT:  Did he give you tax advice only, or did he
22    also take money from you to invest?
23            MR. HANNAN: Well, he gave me tax advice, and then he
24    said, "Sean, I have this great opportunity to invest.  You'll
25    be investing in a portfolio, and you'll get 100 percent of your
```

1  money back in one month."

2      THE COURT:  And did you give him some money?

3      MR HANNAN:  I sure did.

4      THE COURT:  How much?

5      MR. HANNAN:  $40,000.  That's with my mother.  She

6  gave me a portion of it.  She wanted to come today, but it was

7  a bit too much for her.

8      THE COURT:  How old is she?

9      MR. HANNAN:  73.

10      THE COURT:  And then what happened after you gave

11  Mr. Burton the $40,000, as you understand it?

12      MR. HANNAN:  Well, I gave it to him, he said, "Yeah.

13  It shouldn't take too long."  I gave him a big hug.  I was so

14  excited because now I could actually relax.  I don't make a lot

15  of money.  You know, I'm lucky if I make 25 grand a year.  And

16  so I was very excited.  I can relax a little bit, maybe take a

17  vacation with my wife.  I had just got married.  I've been

18  married five years now.

19      And I'm not sure where you want me to go from there.

20      THE COURT:  Now you should finish telling me what you

21  want to tell me.

22      MR. HANNAN:  So physically, it affected me a lot.  I

23  wasn't sleeping.  I started drinking a great deal.  I started

24  smoking.  Every time my dogs barked, I was looking out the

25  window looking for Robert, Mr. Burton.  There became threats

1  from Mr. Burton to me.  I had called the police a few times.  I

2  don't want to go into the threats, but it affected my wife and

3  I.  We were very nervous.  We started talking about divorce.

4        And the thing that's crazy is that my wife is the most

5  awesome woman in the world; and for me to even consider

6  divorce, it was just horrible.

7        THE COURT:  So you gave Mr. Burton $40,000.  Did you

8  ask for it back?

9        MR. HANNAN:  Of course, yes.  Well, as soon as the 30

10 days were up, I said, "Okay, here I am.  Where is my check?

11 Where is my money?  I'm ready, I'm ready, I'm ready.  I'm so

12 excited.  I'm going to buy a new car," whatever I had planned.

13 And he said, "Well, not yet, not yet, not yet."  Then he said,

14 "Tell you what.  Come up to my office.  I got two checks for

15 you."

16       I went up to the office, one for the 40 that invested

17 and one for the 40 that was the return, the profit.  I took

18 both checks to my bank.  I said, "Okay, finally I guess he's

19 going to do it."  Both checks bounced.  They checked funds in

20 the bank.  Both bounced.  I texted him, "Hey, what's going on?

21 Both checks bounced."  "Oh, there must be a confusion.  I put

22 money in that bank this morning."

23       After that it was just over and over and over and

24 over, just lies and delays.  And then he gave me a thousand

25 dollars here and a thousand dollars there.  And finally, I

1    called him -- I went up there one time, and he said, "Oh, yeah.

2    Go up to my office and I'll see you, and you can go through my

3    records," because in the contract I'm allowed to go through his

4    records.

5         He put me in the broom closet.  His secretary put me

6    in the broom closet with scattered records all over the floor,

7    broken computer monitors, a wash bucket.  I was just -- I knew

8    at that point I was already taken advantage of, but I had to

9    keep pursuing it.  I had to keep -- if there's a door that

10   might be cracked open, I have to check it.

11        Anyway.  Very important is it took me so long to save

12   that money.  And in one second, he took it from me.  Like I

13   said, I used to take vacations.  Now that's all gone.  I

14   haven't heard a single ounce of remorse from Mr. Burton.

15   Before we stopped talking to each other, he said, "I love you,

16   man."  "Hey, bro, brother; how you been, brother?"  And that --

17   to be called a brother and a friend -- I mean, I'd check on his

18   house.  I'd help him fix things.  You name it.  A lot of

19   emotional help I would give him, you know, from my heart.  How

20   are you doing?  Are you okay?  What's going on?  Are you

21   working a lot?  How is your girlfriend?  So on and so forth.  I

22   didn't know -- I feel like a sucker, but I'm glad I gave rather

23   than being a standoffish person, you know.

24        THE COURT:  Thank you very much.  Is there more you'd

25   like to say?

1          MR. HANNAN:  There's just one tiny bit.

2          THE COURT:  Go ahead.

3          MR. HANNAN:  You know, part of me wants to say to

4    Mr. Burton, what were you thinking?  Like no one would ever

5    notice?  I mean, I'm not the only one.  Maybe if it was me, it

6    would have been slowly under the rug, but there's several

7    people.  And he told me he was a lawyer, and I said, "Wow, a

8    lawyer.  You got to do the right thing when you're a lawyer."

9    And one thing that taught me a red flag should have went up is

10   when he said the word "axe."  "I 'axe' him how you doing?"  And

11   I just want to say, it's not "axe."  It's "ask."  That's how

12   you pronounce it.  That's my sarcasm.

13          Thank you, Your Honor, for letting me speak.

14          THE COURT:  Thank you.  Is there another victim who

15   would like to speak?

16          MR. COLEMAN:  Hi.  My name is Larry Coleman, and I'm

17   here with my wife Mariam Coleman.

18          THE COURT:  Okay.

19          MR. COLEMAN:  I'm employed as an airline pilot, and I

20   wanted to address the impact of Mr. Burton's actions to the

21   tremendous harm it caused me and my family.  I'm age 56, and

22   the mandatory retirement for airline pilots is 65.  I have nine

23   more years.  What's recently happened with the airlines, with

24   mergers, the consolidation, and the unfortunate part of

25   airlines losing their pension pensions, the only thing that I

1    have is a Fidelity 401(k) program through my company.  So when

2    I retire, when it's mandatory that I retire in nine years, the

3    income or the money that I had in Fidelity was going to be part

4    of my retirement as opposed to -- I cannot fly after 65.  At

5    the time I had -- the money that I invested was close to

6    $100,000 that I had invested with Mr. Burton.  That's

7    approximately.

8            THE COURT:  I think if you move back just a little

9    bit, the microphone won't give you the feedback like that.

10           MR. COLEMAN:  Okay.  Is that better?

11           THE COURT:  We'll see.

12           MR. COLEMAN:  Okay.  Approximately 100,000 is almost

13   half of my balance in my Fidelity 401(k) as I had made

14   withdrawals to invest in Mr. Burton's company.  And once I had

15   met the terms of the money that I withdrew to where Mr. Burton

16   was to manage the funds, once I met the terms on both notes in

17   his investment companies, I had asked him, once I met the

18   terms, please roll it over to my Fidelity 401(k).  And that

19   never happened.  There was a promise that he would send the

20   money to Fidelity.

21           THE COURT:  What did he tell you he was going to do

22   with the 100,000 that he gave you -- I'm sorry -- the 100,000

23   you gave Mr. Burton?

24           MR. BURTON:  Basically it was going to be used for --

25   approximately 75,000 of the $98,000 withdrawal, the 75,000 --

1    one was for 30 and the other one was for $45,000 where I was to

2    make investments with a promise of returns.

3           And once I had met the terms and I requested that the

4    money invested please be rolled over to Fidelity, that never

5    occurred.  So therefore, the $98,000 withdrawn has been lost.

6    But it was $75,000, when you add the 30 and the 45, was the

7    initial investment.

8           But what happened was, also with the $98,000

9    withdrawal, I received a letter from the IRS stating that the

10   98,000 was reported as unreported income, and therefore, within

11   the last year, I have had to come to an agreement with the IRS,

12   and it's for approximately five years at $467 per month from my

13   paycheck.

14          THE COURT:  As you understand it, did Mr. Burton use

15   some of the money you gave him to pay down your mortgage?

16          MR. COLEMAN:  I'm sorry.  Could you repeat that?

17          THE COURT:  Did Mr. Burton use some of the money you

18   gave him to pay off or pay down part of your mortgage?

19          MR. COLEMAN:  (No response.)

20          THE COURT:  All right.  It doesn't matter.  Go ahead.

21   Why don't you just wrap this up.

22          MR. COLEMAN:  Okay.  So basically, what I wanted to

23   express to Mr. Burton and to the Court, I loved Robert as a

24   son, and I gave him complete trust, the same thing with the

25   Coleman family.  And how much harm mentally, emotionally and

1    physically, and -- I've had a hard time getting over how much

2    damage.  And I just hope that when the time comes, if he could,

3    resolve this matter.

4              THE COURT:  Thank you.

5              MR. COLEMAN:  Thank you.

6              THE COURT:  You may be seated.

7              All right.  What then is the government's

8    recommendation, and what are the reasons for it?

9              MS. WALTERS:  Thank you, Your Honor.

10             As set forth in our sentencing memo, the government is

11   recommending a term of incarceration of 37 months to be

12   followed by three years of supervised release, $159,500 to be

13   repaid in restitution to be paid to the four victims who are

14   identified in the Presentence Report, a $7,500 fine and an

15   $1100 special assessment.  The government is also asking as a

16   term of supervised release the Court order that the defendant

17   pay restitution to the IRS of $271,640.

18             THE COURT:  How much?

19             MS. WALTERS:  $271,640.  And also, as the Court

20   acknowledged in the beginning, we filed a motion for

21   forfeiture.

22             THE COURT:  What would be the forfeited?

23             MS. WALTERS:  We are seeking a money judgment of

24   $159,500.

25             THE COURT:  Actually, I don't think I understand that.

```
 1              MS. WALTERS:  So we're seeking -- we would be seeking
 2      a money judgment against the defendant in the amount of the
 3      restitution that continues to be owed and is the ill-gotten
 4      gains from the proceeds.
 5              THE COURT:  But you haven't identified anything yet to
 6      forfeit?
 7              MS. WALTERS:  We have not, no, Your Honor.
 8              In terms of the basis for the government's
 9      recommendation, as we noted in our sentencing memo, it is at
10      the bottom of the range for Criminal History Category II and in
11      the middle of the guideline sentencing range for Criminal
12      History Category I.
13              Your Honor, even if as set forth in his sentencing
14      memo the defendant's intentions may have been good when he
15      started the Pinnacle business to serve an underserved
16      community, he then defrauded members of that community, people
17      who were friends of his.  This is a case, Your Honor, where the
18      guidelines get it right.  It's a real loss to real human
19      beings.  You've heard from some of them here today.  And
20      there's two other real human beings who suffered a loss.
21              THE COURT:  What did Mr. Burton do with the money?
22      According to the Presentence Report, the government's evidence,
23      did he actually -- I mean, I've read the Presentence Report.
24      Did he invest any of it, or did he just use it for himself?
25              MS. WALTERS:  No.  He used it for personal purposes.
```

1    With the Colemans money, Your Honor, he used it for his own

2    personal debt.  He took out cash.  He paid cable bills.  There

3    was food.  There were hotels that were paid for.

4         With Mr. Hannan's money -- and all this money of

5    course was sort of put in a slush fund account, but there were

6    cash withdrawals.  Jewelry was purchased.  He appears to have

7    made payments toward a wedding, the Mirage in Dubai.

8         THE COURT:  I'm sorry.  Say that again.

9         MS. WALTERS:  He stayed at the Mirage in Dubai, I

10   believe, shortly after taking Mr. Hannan's money.  And with

11   some of the other victims' money, it appears that withdrawals

12   were made to pay for furniture, clothes and electronics.

13        THE COURT:  And the Presentence Report says that he

14   told the victims he had invested their money and created false

15   documents available on the web to lead them to believe that

16   their money was in individual accounts that had appreciated.

17        MS. WALTERS:  That's exactly right, Your Honor.  With

18   Mr. Coleman, for example, he provided account statements

19   showing that his money had been invested in something called

20   the Pinnacle Fund and a variety of what appeared to be maybe

21   made-up funds.

22        Mr. Coleman at one point believed that the $75,000 he

23   had given to Mr. Burton for investment had appreciated to over

24   $100,000.  And that led to some of Mr. Coleman's confusion

25   because he believed that he had an investment that had

1    appreciated from $75,000 to over $100,000.  And that adds to

2    the tragedy of this.

3          Mr. Hannan thought he was going to have $80,000, and

4    he doesn't even have $40,000.  Mr. Coleman was relying on the

5    appreciation of the money that he gave Mr. Burton and actually

6    even was looking at a document that Mr. Burton provided,

7    thinking his investment had appreciated.

8          So obviously we're not even asking for those fake

9    returns to be returned as restitution.  We're just asking for

10   their initial payment.  But this man led these people to

11   believe that they were in real investments that were

12   appreciating and that they could count on for their retirement

13   or other savings.

14         With regard to Mr. Hannan and then one of the other

15   victims identified in the indictment, Mr. Burton created

16   offering memoranda and led them to believe that they were going

17   to be investing in some type of -- in Pinnacle as a business

18   and some specific type of debt portfolio and obviously just

19   spent the money.

20         So this is a case where, with the guidelines, they get

21   it right because it's real loss.  This isn't -- Mr. Cruz in his

22   sentencing memorandum cited a lot of cases where the loss was

23   in the millions, hundreds of millions of dollars, and the

24   courts probably correct in a lot of those cases, decided a

25   variance was appropriate because the loss really overstated

1    culpability in those cases.  Those are -- I didn't get to look

2    at every single one of them, but I was able to look at some of

3    them and confirm what I suspected, which is that those were

4    pump and dump schemes, revenue recognition schemes where the

5    loss becomes astronomical.  This is not an astronomical loss.

6    This is a real loss by real human beings and very accurately

7    captures his culpability here.

8         The same thing with the investment guideline.  He led

9    Mr. Coleman to believe that he was going to take care of this

10   for him, act as a true investment advisor.  One of the other

11   victims he led to believe the same thing.  "I'm going to take

12   care of your retirement money for you, and I'm going to invest

13   it in ways that will benefit you."

14        And so in addition, with Mr. Hannan, he pressured him

15   relentlessly by text-messaging, giving him false deadlines that

16   he had to get in on this investment now.  He was desperate to

17   get his hands on this money.  No amount of good intentions and

18   starting Pinnacle can take away from the damage that Mr. Burton

19   has done here.

20        One of Mr. Burton's primary arguments in support of a

21   significant variance here is that he should not be incarcerated

22   for a lengthy period of time so as to allow him to get back out

23   on the street and start earning money again to make restitution

24   to these victims.  Obviously, by the government's initial plea

25   agreement, restitution is important here.  It's why we're --

1    obviously, the Court will enter a restitution order, but with

2    all due respect, Mr. Burton had a chance to make restitution to

3    his victims.  And he doesn't have a very good track record

4    here.  He has flouted a bankruptcy order that directed him to

5    make payments to certain of his clients.  That order was in

6    place in May of 2013.  He had a variety of opportunities to

7    make restitution here.  In fact, he represented to Chief

8    Magistrate Judge Boal that he had $27,000 sitting in the bank.

9    He's not offering to make that payment up front now.

10   Mr. Burton had his chance.  He doesn't have a good track

11   record.

12           THE COURT:  Does the government have any information

13   as to whether he actually has $27,000 or anything like that?

14           MS. WALTERS:  Beyond the representations he's made, we

15   don't.  We don't have good bank account information.  We're not

16   in the position to -- I've been in consultation with folks in

17   my office.  If there's some steps we could take to collect that

18   following the restitution order, we will obviously do that as

19   best we can, but we don't have specific information.

20           So this is a case that warrants -- it's a serious

21   offense that warrants a significant sentence of incarceration

22   to punish this defendant, to deter this defendant and obviously

23   for general deterrence as well.

24           And briefly, Your Honor, in terms of the tax charges

25   here as well, which do add a bump to the sentencing guidelines,

1   Mr. Burton pretended to offer tax preparation services to an

2   underserved community.  As set forth in the PSR and the

3   government's sentencing memorandum, there are two people whose

4   taxes he screwed up to the point of criminality where he

5   intentionally misrepresented them.  Mr. Coleman being one of

6   them.

7        As Mr. Coleman said, he is an actual victim here, not

8   just of the investment fraud but of the tax fraud that

9   Mr. Burton perpetrated.  He did that to another victim as well.

10  But he also subjected so many clients to civil audits where

11  there was all kinds of misstatements of income, and then he

12  also offered to represent them in those civil audits.  This was

13  not some do-gooder type of service that was going on here.

14       Then finally, which should give us all insight into

15  this defendant as well, is the fact that he misstated his own

16  income dramatically.  He evaded $150,000 of taxes over four

17  years himself.  It wasn't just that he understated his income.

18  He actually falsely claimed that he had dependents living with

19  him.  The significance of that is that it allowed him to claim

20  an earned income tax credit, which as he knows is intended for

21  low-income people, to reduce his tax burden even further.

22       So this defendant wasn't just taking other people's

23  money, screwing up other people's taxes.  He was cheating the

24  government himself.  And I think that gives real insight into

25  this defendant and why a sentence of significant incarceration

1    is appropriate.

2            THE COURT:  Thank you.  Mr. Cruz.

3            MR. CRUZ:  Yes, Your Honor.

4            Your Honor, first of all, I'd like to on behalf of

5    Mr. Burton -- and he'll have an opportunity to do this as

6    well -- give deepest apologies to the people in the courtroom

7    who spoke, who expressed the pain and the difficulties that

8    they have suffered because of Mr. Burton's actions.

9            In addition to that, Your Honor, I would suggest to

10   the Court that my sentencing recommendation is not meant to

11   minimize that pain, that difficulty, that suffering.  I am

12   simply trying to suggest a balance where the Court gives

13   Mr. Burton a sentence that recognizes the seriousness of the

14   offense but also allows him an opportunity to make restitution

15   to the victims in this case as quickly as possible.

16           THE COURT:  Why don't you state what your

17   recommendation is.

18           MR. CRUZ:  Yes, Your Honor.

19           My recommendation at this point is that the Court

20   sentence Mr. Burton to a 12-month sentence.  And this is a

21   hybrid sentence in the sense that six months would be served in

22   custody and the remaining six months would be served in home

23   confinement.  The term of incarceration would be followed by a

24   term of supervised release of three years, the first six months

25   of which would be served in this home confinement sanction, if

1    you will.

2              Again, this is an effort to strike a balance to allow

3    Mr. Burton to obtain work as he's clearly able to do based on

4    his education and background so that he can repay the victims

5    as quickly as possible.

6              THE COURT:  Well, did he tell Magistrate Boal that he

7    had $27,000 to pay toward the $50,000 that he promised to pay

8    before sentencing?

9              MR. CRUZ:  That was the representation that was made

10   to Magistrate Judge Boal, Your Honor, yes.

11             THE COURT:  Does he have the $27,000?

12             MR. CRUZ:  He does, Your Honor.  And let me follow up

13   on that, Your Honor.  As the Court knows from the history or

14   the circumstances background of Mr. Burton, he does not just

15   have this federal criminal matter pending.  He also has a

16   matter that's before the bankruptcy court, and he also has a

17   matter pending before the Massachusetts Attorney General or

18   before the state courts that's brought by the Massachusetts

19   Attorney General.  He owes the bankruptcy court approximately

20   $53,000.  He also owes the State Attorney General approximately

21   $240,000.

22             Now, the purpose of the meeting on September 30 at the

23   bankruptcy court where Mr. Burton was found in contempt and

24   taken into custody by Judge Boroff was to try to figure out who

25   would get priority in terms of payments.  We have disgorgement

1    of fees ordered by the bankruptcy court of $53,000 that has to

2    be met.  We also have the fees or a fine associated with the

3    Attorney General case.  And my understanding is that

4    representatives from the U.S. Attorney's Office, Ms. Walters,

5    the State Attorney General's Office and obviously the

6    bankruptcy court personnel were all a part of this meeting, and

7    it wasn't ultimately determined what the pecking order would

8    be, if you will, with regard to priority of payment.

9            THE COURT:  Were any of the victims of this case

10   Castillo, Coleman, Hannan or Vozzella involved in the

11   bankruptcy matter?

12           MR. CRUZ:  Not to my knowledge, Your Honor.

13           MS. WALTERS:  Not to my knowledge either, Your Honor.

14           THE COURT:  Okay.

15           MR. CRUZ:  So the reason why Mr. Burton was taken in

16   custody at that point was because he had to provide certain

17   financial information to Judge Boroff to confirm what his

18   income was for a specific period of time.  Mr. Burton had some

19   information available for him, but it was not satisfactory to

20   Judge Boroff, who then decided to take him into custody on a

21   contempt finding.  Mr. Burton was able to provide the

22   information that Judge Boroff had asked for ultimately, and he

23   was released some time later, and that's why we asked Judge

24   Boal to reconsider her detention order.

25           Now, it's true that Judge Boroff suggested that the

1    original May order, the May 2013 order had not been met in

2    terms of the payment, but there's another hearing scheduled in

3    January to address those issues.  And Judge Boroff was

4    comfortable releasing Mr. Burton at that time.  So we went

5    before Magistrate Judge Boal.  We requested that he be

6    released.  We made the representation regarding the $27,000 and

7    also efforts on Mr. Burton's part to sell whatever assets he

8    had remaining in order to make up the difference.

9             I think it's important to note, Your Honor, that

10   because there was some grey area or confusion about priority of

11   payment, Mr. Burton was in a difficult position.  He wanted to

12   be released in order to try to make the restitution that he had

13   agreed to in a written agreement with the government.  The idea

14   at that point was to prioritize this case to use the monies he

15   had available in conjunction with whatever monies he could

16   generate from selling assets in order to satisfy this

17   condition.  Unfortunately, he was ordered detained and he's not

18   able to do that.  At this point what Mr. Burton --

19             THE COURT:  Why couldn't he pay the $27,000 while he

20   was detained?

21             MR. CRUZ:  In order for that to happen, Your Honor, he

22   had the possibility of running afoul of Judge Boroff in terms

23   of the 50-something-thousand dollars he owes in that

24   proceeding.  He also had the potential of running afoul with

25   the State Attorney General proceeding and the 200,000 that he

1    owes in that situation.

2          He's asking the Court at this point for some guidance,

3    if you will.  This Court is going to order a certain amount of

4    restitution to be paid.  If Your Honor makes the determination

5    that this case should take precedence, then he's prepared to

6    turn over whatever monies he has available as quickly as

7    possible in order to address the restitution obligation.

8          And I think the Court can understand that because so

9    many individuals or so many parties are involved at this point,

10   it becomes difficult in terms of honoring various obligations

11   and trying to figure out whether there is going to be problems

12   if we pay one individual and do not pay another or that payment

13   is delayed.

14         In any event, Your Honor, this is, as you know from

15   reviewing Mr. Burton's record, really his first serious

16   offense.  He has no criminal history to speak of other than

17   this continuance without a finding, by the way which the

18   government also agrees overstates, to a certain extent, his

19   criminal history.  It's a continuance without a finding that

20   brings him to Criminal History Category II for a variety of

21   different reasons, so we would make a similar argument that

22   this is more akin to a Criminal History Category I.

23         THE COURT:  If it was Category I, the guidelines would

24   be what?

25         MR. CRUZ:  33 to 41 months, Your Honor, with the

1    offense level calculation we have in the PSR.  So the

2    government is requesting the 37 months, Your Honor, and I am

3    asking for the hybrid sentence of six months in custody and six

4    months in home confinement with a lengthy supervised release

5    period in which time Mr. Burton can be supervised and monitored

6    by the Court in terms of his ability to make payments.

7            Certainly if that does not happen, he would run afoul

8    of any orders this Court issues with regard to supervised

9    release conditions and could be placed into custody again.  He

10   understands that, Your Honor.  And a lot of what I state in the

11   sentencing memorandum, Your Honor, has to do with his

12   background as a law school graduate, his attempts to make a go

13   of this business involving financial services to an underserved

14   community in Pinnacle.

15           THE COURT:  Well, but the Presentence Report says that

16   he misrepresented himself.  For example, paragraph 16, he

17   claims that he previously worked as a financial advisor of

18   Deutsche Bank, which was not true; he had been employed in an

19   administrative capacity there.  Right?

20           MR. CRUZ:  Those representations were made, Your

21   Honor, yes.

22           THE COURT:  And it appears to me that the crimes

23   involved in this case started, at least the scheme to defraud

24   investors started with Castillo in 2007, and it continued

25   through 2011 with the Colemans.

1          MR. CRUZ:  Those were the dates in which the

2    investments were made, Your Honor.

3          THE COURT:  So he was doing this over a period of

4    time.

5          MR. CRUZ:  Correct, Your Honor.  Your Honor, what I

6    would emphasize in that regard, Your Honor, is, as you know, a

7    lot of what happened in terms of these arrangements came about

8    because of the personal relationships involved.  It's

9    unfortunate that the strategy, if you will, that landed

10   ultimately Pinnacle into problems with the bankruptcy court and

11   the Attorney General also bled into the situation with these

12   financial agreements.

13         THE COURT:  Well, what was -- what was the strategy?

14   I don't get -- I don't have the sense from what I've read that

15   Mr. Burton invested the funds and the investment performance

16   wasn't good.  It's my understanding that he took the funds and

17   used them for his personal use while he represented that he was

18   investing them on behalf of his clients.

19         MR. CRUZ:  Well, Your Honor, my understanding is that

20   a lot of the money that we're talking about in terms of the

21   $159,000 investments was tied up in this debt portfolio

22   situation.  The government has alluded to that.

23         THE COURT:  What's the debt portfolio situation?

24         MR. CRUZ:  This is a distressed debt fund that

25   Mr. Burton had been involved in.  And essentially how it works,

1    if I understand it correctly, is that anyone that has a certain

2    amount of funds available can buy what's known as distressed

3    debt.  They buy it for pennies on the dollar, and then they are

4    able to try to get these -- collect these monies on their own

5    to work with this portfolio, in other words, with individual

6    people who owe the money and get a return on that particular

7    debt.

8          THE COURT:  Where is that discussed in the Presentence

9    Report?

10         MR. CRUZ:  It's discussed in the government's

11   statement of the offense.

12         THE COURT:  I know, but the facts -- what evidence do

13   I have that he invested their money in any kind of legitimate

14   investment rather than going to Dubai or something?

15         MR. CRUZ:  Your Honor, if I can explain this, I think

16   the issue is that certain representations were made by

17   Mr. Burton about what he was going to do with the money.  And

18   as you can tell at least from one of the statements that was

19   made this afternoon, there was a lot of confusion about exactly

20   what was happening with the money.

21         My understanding is that, at least with regard to some

22   of these individuals who lost money, that the funds were tied

23   up in this debt portfolio situation, that he had made a

24   representation based on his thinking that he could get the

25   money back within a certain period of time, and that didn't

1    happen because he didn't do the work.  He didn't go after the

2    individuals who owed these funds and didn't collect what he

3    said that he would and didn't make good on his promise to

4    return the investment plus 100 percent profit within 30 days,

5    which I think were the terms of the agreement, Your Honor.  So

6    that was not true, obviously.  That was a misrepresentation.

7    So the issue is, Your Honor, that these things happened and the

8    monies were not returned as promised because of his lack of

9    diligence in working to get the monies back.

10           What I would suggest to the Court, Your Honor, is that

11   the sentence that I am recommending does give the individuals

12   involved in this case the best chance, if you will, to get

13   their money back quickly.  He is capable of doing this.  He can

14   sell off assets once he has the ability --

15           THE COURT:  He can sell of what assets?

16           MR. CRUZ:  He has a home, Your Honor, the property

17   that's mentioned in the PSR.

18           THE COURT:  It appears that the mortgage is more than

19   the tax assessed value.  Does he have any equity in the home?

20           MR. CRUZ:  He believes that he does, and he'll have to

21   realize it through a potential sale.  There's also an

22   automobile that's mentioned.  He also has access to the debt

23   portfolio that I mentioned that he would have to do various

24   pieces of work in order to convert into the funds.

25           THE COURT:  Paragraph 104 tells me he didn't submit a

1    financial statement.

2         MR. CRUZ:  Yes, Your Honor.

3         THE COURT:  So what evidence do I have that this debt

4    portfolio exists?

5         MR. CRUZ:  Your Honor, the only evidence that the

6    Court has at this point is the representation I'm making.

7         THE COURT:  I know, but you don't have personal

8    knowledge, do you?

9         MR. CRUZ:  I don't have any paperwork related to that,

10   Your Honor.

11        THE COURT:  Right.  You know what your client told

12   you.

13        MR. CRUZ:  Correct.

14        THE COURT:  And the one thing that's not in dispute

15   here is your client has lied to many people who trusted him.

16   You might be in the same category.

17        MR. CRUZ:  Well, Your Honor --

18        THE COURT:  But that's not the point.  The point is I

19   have to decide this based on facts which are established by

20   evidence.  There's no financial statement.  I have no evidence

21   that this portfolio exists.  And your client had the chance to

22   get a 12 to 24-month sentence by paying $50,000 as he agreed to

23   in the plea agreement.  He didn't do it.

24        Anyway, go ahead.  Is there more you'd like to say?

25        MR. CRUZ:  No, Your Honor.  What I'd like the Court to

1    do is just consider the recommendation and strike a balance as

2    best you see fit.

3              THE COURT:  Thank you.  You expressed that extremely

4    well in writing and then orally here today.

5              Mr. Burton, you now have an opportunity but not an

6    obligation to speak before I decide what sentence to impose.

7    That means you don't have to say anything if you don't want to,

8    but if you'd like to say something for me to consider, now is

9    the time.

10             THE DEFENDANT:  Sure.

11             (Defendant conferring with counsel.)

12             THE DEFENDANT:  Thank you, Your Honor, for allowing me

13   to address you today.

14             It's been a long, long haul.  It's been about four

15   years of my life going through the civil process of the courts,

16   whether it be the bankruptcy matter, whether it be the Attorney

17   General case and then this criminal case.

18             I want to first really apologize for even being in

19   front of you like this.  When I started my business, I started

20   my business in my apartment in law school, really thinking that

21   I was going to create something that no one else had done.  And

22   for a good period of years, I did.

23             I know that the last four years has been difficult on

24   all the parties here.  There are friends and family in this

25   courtroom today, Your Honor, and it's the first time I've had a

1    chance to address them.  And I want to not only just apologize

2    to them but let them know that I feel their pain.  I know that

3    the -- that what they saw in me, whether it be my sincerity

4    with them that I really did care for them, allowed them to

5    trust me unequivocally.  And I made some poor decisions.

6         When you run around and you're running a business and

7    you have multiple offices, you have employees, there's a lot of

8    noise.  And with that noise comes really confusion sometimes.

9    I was in a situation where I was rushing through life.  I was

10   my own worst enemy.  I was setting unrealistic goals for myself

11   and for my company, and I got to the point where I was

12   overwhelmed.  I misled them.  I hurt them.  And I'm forever

13   going to be sorry for that.

14        What I'd like you to consider, Your Honor, is the fact

15   that the last six months or so, especially being incarcerated,

16   I've had time to really step back from life, step back from the

17   toxic relationships that I've had in my life that clouded my

18   business judgment, that clouded my ethics, that clouded my

19   morals.

20        I know that you've asked Mrs. Walters and Mr. Cruz

21   certain facts about the investment and about sort of what

22   happened.  And I know you're probably still curious, and I'm

23   open to answering those questions.  I would like to have an

24   opportunity to sort of have some clarity, and once this is all

25   over with, to pay them back.

1          The plea agreement I entered into, I didn't sign that

2    haphazardly.  I had signed that agreement with full intent of

3    meeting my obligations.  You know, when you're dealing with

4    sort of three and four serious civil matters and this criminal

5    case, you're going to make some mistakes.  You know, you're

6    going to not ask for the right advice.  You're going to be

7    overwhelmed, you know.  And I made those mistakes, and I want

8    to take full responsibility for it.

9          There's nothing -- I don't want you to be confused at

10   all that I'm a person that preyed on my friends and family.  I

11   simply made some mistakes in judgment.  I want to -- you to

12   know that this will never happen again, that you'll never see

13   me again in this courtroom in this context, that I will do

14   everything in my body to make amends.

15         And I know you've heard that probably a thousand

16   times.  I'm not asking you to believe me.  I'm asking you to

17   believe in me.  I'm asking you to believe that I have the

18   ability and I have a plan in place that, when you give me the

19   go-ahead, I need to go ahead and sell my assets, get back to my

20   business, get back to being a good, productive member of

21   society.  Any leniency that you can give me, Your Honor, it

22   won't be for me, per se.  It would be for me to quickly obtain

23   employment, run my business, make money and pay these

24   individuals back.

25         Again, Your Honor, I'd like to again just say that I'm

1    really sorry for being in front of you.  I'm ashamed by what's

2    happened here.  You know, these people were just not people,

3    strangers.  These people were people I shared many memories

4    with, Christmases, holidays.  And I know that I hurt them and

5    that those memories are erased by my actions, by my conduct,

6    and I take full responsibility for that.  And I'm just asking

7    you for the first time be the first judge to give me an

8    opportunity to get out there and make this right.

9        So I appreciate your time, Your Honor, and again, I

10   apologize to the people that were hurt here.  These were my

11   friends and family members, and I just want to get this over

12   with and make amends and make it right.  I want you to know

13   that I can learn.  The last six months have been, you know, an

14   incredible experience, and I want you to trust me that I will

15   make this right.

16       Thanks, Your Honor.  Thank you.

17       THE COURT:  All right.  Mr. Burton, please stand.

18       In connection with the 11 counts to which you pled

19   guilty, I hereby sentence you to serve 48 months, four years,

20   in the custody of the Attorney General of the United States, to

21   be followed by three years of supervised release on the

22   standard condition and on the additional conditions --

23   actually, it's three years of supervised release, which is

24   three years on Counts 1 and 5, in terms of one year on Counts 6

25   through 11 to run concurrently.

1          I'm ordering in addition to the standard conditions

2    that you make restitution in the amount of $159,500, payable as

3    $25,000 to Ariel Castillo, $75,000 to Larry and Mariam Coleman,

4    $34,500 to Sean Hannan, $25,000 to Edward Vozzella, and I'm

5    ordering that you pay $50,000 of that by January 19, 2015.

6          In addition, the payment of the remaining restitution

7    shall begin immediately according to the requirements of the

8    Federal Bureau of Prisons Inmate Financial Responsibility

9    Program while you are incarcerated and according to a court

10   ordered repayment schedule during the term of supervised

11   release.  All restitution payments shall be made to the clerk

12   of this court, and if the $50,000 isn't paid by January 19, I'm

13   ordering that the government let me know on whether it moves

14   for a proceeding to determine the defendant's ability to pay.

15         I've imposed a fine of $7,500 consisting of $1,500 on

16   each of Counts 1 through 5 and no fine on Counts 6 through 11.

17   Payment of the fine shall also begin immediately according to

18   the requirements of the Bureau of Prisons program.  Any amounts

19   of restitution, although I may not have said it, shall go

20   proportionally to the victims in this case.

21         With regard to special conditions, you may not possess

22   a firearm or other dangerous weapon.  You may not engage in any

23   occupation or business or profession that would require or

24   permit you to provide tax preparation, investment advice, loan

25   modification, debt consolidation or bankruptcy petition

services.  You are to pay 25 percent of all future earnings

toward the balance of any restitution imposed.  You shall pay

the fine on a court ordered repayment schedule.  You shall pay

restitution in the amount of $271,640 to the Internal Revenue

Service according to a court ordered repayment schedule.

You may not incur any new credit charges or open any

additional lines of credit without approval of the probation

office while any financial obligations remain outstanding.  You

must provide the probation office access to any requested

financial information which may be shared with the Financial

Litigation Unit of the U.S. Attorney's Office or anybody else

with the U.S. Attorney's Office, and you shall meet with the

Internal Revenue Service within the first 90 days of your

period of supervised release to determine the prior tax

liability and file tax returns and pay or make arrangement to

pay any past or future taxes due.

You have a right to appeal this sentence within 14

days from the entry of judgment.  If you can't afford a lawyer

and would like to appeal, a lawyer will be appointed to

represent you at public expense.  It's my duty to give you the

sentence that I find is sufficient but no more than necessary

to serve the statutory purposes of sentencing.

The only concern I have about the sentence I just

imposed is that it may be too low to do that.  As far as I'm

concerned, you're an eloquent, thorough fraud.  I can see by

1  the way you spoke today why people relied on you, vulnerable

2  people who genuinely cared for you and who you knew really

3  needed the money that you were taking from them.

4         You said your life was going too fast.  This sentence

5  is intended in part to slow it down, to get you to really start

6  understanding and believing what you said to me today, which I

7  don't believe.  You said that you didn't prey on your friends

8  and family.  You did prey on your friends and family.  You knew

9  they needed that money.  And you did it because you were

10 selfish and greedy, from everything I can see, not because

11 there was any good reason to do it.  You evidently have the

12 energy and intelligence to work honestly.  You just chose not

13 to.

14        I've considered the nature and circumstances of your

15 crime.  You engaged in a series of frauds from at least 2008 to

16 2011.  You in this case defrauded people who had come to trust

17 you.  You knew they weren't sophisticated.  You knew they were

18 vulnerable.  You betrayed their trust.  You put your interests

19 totally ahead of theirs.  You lied to them to get them to give

20 you their money when you knew they didn't really have much

21 money.  You lied to them about what you did with their money.

22 You lied to them by showing them accounts, records of accounts

23 that didn't exist.

24        I've looked at your own history and characteristics.

25 You were able to go to college.  You were able to go to law

1   school.  You don't have a drug addiction from anything I see in

2   the Presentence Report.  There's no excuse, other than greed.

3   You committed a very serious offense, and this sentence is

4   intended to reflect the seriousness of that offense and provide

5   just punishment for it.

6          Any sentence is intended to serve the purpose of

7   deterrence, which has two dimensions; the specific deterrence,

8   the need to send you a message.  I'm trying to send you a

9   message that when you commit crimes, when you continuously lie

10  to people, including judges, you're not going to get away with

11  it.  There are going to be serious consequences.  It's not just

12  wrong; it's dumb to defraud people, and you're not going to be

13  able to talk your way out of it.  The sentence is also intended

14  to send a message to other people who might calculate that it's

15  worthwhile to defraud vulnerable victims, particularly if you

16  can get them to trust you.  The message that you and others

17  should get is that it's not just wrong; it's dumb.  You'll get

18  caught.  You'll get convicted.  You'll get a serious

19  punishment.

20         This sentence is meant to protect the public from

21  further crimes by you.  I'm deeply concerned that if I in

22  essence released you now, gave you the six-month sentence that

23  Mr. Cruz so eloquently advocated, you would be dangerous.  If

24  you needed money, you'd commit more crimes to get it, whether

25  to pay the victims in this case or more likely to live more

 1  comfortably yourself.

 2        So an important part of this sentence is to protect

 3  the public from the danger you represent.  I don't find that

 4  you need any education or vocational training.  What you need

 5  is to understand that, as I said, it's not just wrong; it's

 6  dumb to do this.  The sentence is higher than the guideline

 7  range, I know it.  But as I said, it's my statutory obligation

 8  to impose the sentence that's minimally sufficient and no more

 9  than necessary to serve the purposes of sentencing.  And having

10  heard you today and assessed your credibility, your

11  believability, my concern, as I said, is not that the sentence

12  is too high but that it's too low to protect the public and to

13  send you a message.

14        I don't believe that if you were out that you would

15  work industriously to pay back Mr. Hannan and the Colemans and

16  the person whose name has been redacted from the victim impact

17  letter, the military chaplain who served two overseas tours in

18  Iraq and gave you his money and was betrayed by you.  I know

19  they would like their money back, but letting you out in my

20  judgment would not result in that.  However, I have been told

21  you have $27,000 and you may have equity in your house.  I am

22  ordering -- I have ordered that you pay $50,000 essentially

23  within a month.  And that should simplify things.  This is, as

24  I understand it, superior to Judge Boroff's orders, superior to

25  the Attorney General's order.  This is a judgment in a criminal

1    case.  So now you know where the money should go, and based on

2    what I've been told today, at least $27,000 of it should get

3    there soon.

4         MR. CRUZ:  If I may, Your Honor, could I ask that the

5    Court consider simply ordering the $27,000.  The reason for

6    that is if Mr. Burton is not able to attend to these assets to

7    generate income from them himself, he's likely to fall short of

8    that $50,000 mark.  Based on your comments, there's no way the

9    Court would allow him to self-report to do this.

10        THE COURT:  No, I'm not going to allow him to

11   self-report.  I thought about the 27.  If he doesn't have more

12   than that, he can't be ordered to pay it.  If he does have it,

13   he should pay it.

14        What's the government's view on whether it should be

15   27 or 50?

16        MS. WALTERS:  Your Honor, I think pursuant to

17   forfeiture proceedings, frankly, we could do some discovery to

18   figure out if he's capable of paying the additional 13,000.  I

19   think the government is of the view that --

20        THE COURT:  I think it would be 23.

21        MS. WALTERS:  Yes, Your Honor.

22        MR. CRUZ:  And perhaps what we could do is we could

23   come to an agreement in that regard and confirm --

24        THE COURT:  No.  It's 50.  It's 50.  But, you know, if

25   you come to an agreement that he can't pay 50, then there's no

1    need for further proceedings.  If there's a significant

2    question about whether he can pay 50 or indeed more than 50,

3    you'll be back in front of me.  I'll resolve the question --

4              MR. CRUZ:  Understood, Your Honor.

5              THE COURT:  -- based on whatever the evidence is.

6              MR. CRUZ:  I'm just trying to avoid any other

7    consequences.

8              THE COURT:  I hope I won't see you again.  And if he

9    really can't pay more than 27, if you satisfy the government on

10   that, I'll be told, and we won't spend time on it.  On the

11   other hand, I'm concerned.

12             MR. CRUZ:  Understood.

13             THE COURT:  There's an order of forfeiture I need to

14   enter.

15             MS. WALTERS:  Yes, please, Your Honor.

16             THE COURT:  You may be seated.

17             There's an $1100 special assessment, which I believe I

18   said, but if I didn't, now I've said it.

19             All right.  Is there anything further on this matter

20   for today?

21             PROBATION:  Your Honor, I may have missed it, but I

22   wanted to note for the Court that in terms of Counts 6 through

23   11 there's a statutory maximum penalty of incarceration of 36

24   months.

25             THE COURT:  Here.  Can I see you at sidebar, please.

1            (The Court conferring with Probation.)

2            THE COURT:  Let me amend what I said if I said it

3   wrong.  On Counts 1 through 5, I've imposed to run concurrently

4   a 48-month sentence.  On Counts 6 through 11, each a

5   three-year, 36-month sentence to run concurrently because three

6   years is the maximum.

7            All right.  Court is in recess.

8            (Adjourned, 4:28 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3             I, Kelly Mortellite, Registered Merit Reporter

 4   and Certified Realtime Reporter, in and for the United States

 5   District Court for the District of Massachusetts, do hereby

 6   certify that pursuant to Section 753, Title 28, United States

 7   Code that the foregoing is a true and correct transcript of the

 8   stenographically reported proceedings held in the

 9   above-entitled matter and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                     Dated this 26th day of January, 2017.

13

14                     /s/ Kelly Mortellite

15                     _____

16                     Kelly Mortellite, RMR, CRR

17                     Official Court Reporter

18

19

20

21

22

23

24

25
```