UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT BURTON | ) | No. 13-cr-10292-MLW |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

**GOVERNMENT'S PARTIAL OPPOSITION TO BURTON'S MOTION TO VACATE,
SET ASIDE OR CORRECT SENTENCE, PURSUANT TO §2255**

On August 21, 2014, pursuant to a plea agreement made under Federal Rule of Criminal

Procedure 11(c)(1)(C), Burton pleaded guilty to all 11 counts of the above-captioned Second

Superseding Indictment, and admitted to defrauding four investors, filing false tax returns on

behalf of two of them, and filing his own false tax returns.  In advance of the sentencing hearing,

however, Burton breached the agreement by failing to pay restitution as agreed and, by agreement

of the parties, the U.S. Attorney exercised her right to void the agreement.  On December 22, 2014,

the Court conducted a colloquy of Burton and afforded him the opportunity to withdraw his guilty

plea.  The defendant opted not to withdraw his plea and the Court proceeded to sentencing.

Since then, Burton filed an appeal, which he withdrew, and continued to file numerous

requests to amend his sentence and restitution order as well as two Motions to Vacate, Set Aside

or Correct Sentence, Pursuant to 28 U.S.C. §2255.  The Court has sorted through many of these

Motions, and directed the government to respond to the second Motion to Vacate, Dkt. No. 137

1

("Section 2255 Petition"), which alleges 16 separate grounds for relief:  nine based on alleged

ineffective assistance of counsel (Grounds One through Nine); one based on a purported <u>Brady</u>

violation (Ground Ten); one based on alleged "newly discovered evidence" (Ground Eleven); and

five based on alleged procedural deficiencies at his plea and sentencing hearings (Grounds Twelve

through Sixteen).  In a separate Motion to Amend Sentence and Correct Restitution Amount, Dkt.

No. 162, Burton essentially claimed that evidence—in the form of "testimony"—in a follow-on

Securities and Exchange Commission proceeding demonstrated that he was responsible for a lower

loss amount than had been attributed to him in the criminal case.  Because Burton filed these

motions *pro se*, the Court construed the request "liberally" as a Motion to Amend his Section 2255

Petition to include a claim that the imposition of a sentence based on an inaccurate financial loss

calculation is a miscarriage of justice.  *See* Memorandum and Order ("Order"), Dkt. No. 169 at 4.

As required by the Order, therefore, this Opposition addresses that issue as well.

Because the petition raises claims of ineffective assistance of counsel, some of which may

require information supplied by Burton's trial counsel, the government filed a Motion for Order

Regarding Waiver of Attorney-Client Privilege and asked the Court either to enter such an Order,

or conduct a colloquy with Burton and afford Burton the opportunity to preserve the privilege and

withdraw those claims.  *See* Dkt. No. 170.  Burton subsequently filed, *pro se*, a document waiving

his privilege, Dkt. No. 175, and the Court therefore found the government's Motion for an Order

Regarding Waiver moot.  *See* Dkt. No. 179.  As set forth further below, however, defense counsel

is not comfortable relying on the *pro se* waiver and the government remains unable to respond to

all of the ineffective assistance of counsel claims.

Accordingly, this Opposition specifically addresses the remaining claims (Claims Eleven through Sixteen and the Claim raised in the Motion to Amend), many of which are based on falsehoods, and none of which are sufficient to state a claim under Section 2255.  At least some of the ineffective assistance of counsel claims also appear, on their face, to lack merit.

## Background

### I.      The Criminal Conduct

As set forth further below, Burton ran a financial services business, originally located in Boston and later located at various offices in Lawrence.  Although he changed the name, the business generally was called "Pinnacle" and provided tax preparation, investment advisory, loan modification, debt consolidation and bankruptcy petition preparation services.[1]

The charges to which Burton pleaded guilty fall into three categories:  (1) fraud charges based on his misappropriation of funds invested with him; (2) tax charges based on his preparation of false returns for two of his clients; and (3) tax charges based on his preparation and filing of his own false returns.

### A.  Overview of Pinnacle

Burton owned and operated a financial services company that went by various different names, including Pinnacle Financial Consulting, LLC, Pinnacle Strategic Investments, LLC, Pinnacle Asset and Capital Management, LLC, Pinnacle Financial and Legal Solutions, LLC,

---

[1] This recitation of facts is based on the Offense Conduct set forth in the Pre-Sentence Report ("PSR"), to which Burton did not object, *see* Sentencing Hearing Transcript, Dkt. No. 173 at 9–10, and the facts proffered at the change of plea colloquy that also were unchallenged by Burton, *see* Plea Hearing Transcript, Dkt. No. 172 at 20–25.

Pinnacle Management Group, LLC and Pinnacle Holdings, LLC (collectively, "Pinnacle").

Burton, through Pinnacle, offered various financial services, including tax preparation,

investment advising, loan modification, debt consolidation and bankruptcy petition preparation.[2]

*See* PSR at 5.

### B. The Fraud

A. <u>Scheme to Defraud Investors:  Counts One through Five</u>

According to Burton's employees, Burton's investment advisory services were not the

primary focus of his business.  Indeed, it appears that the "investment advising" was something

that Burton did himself and it was a much smaller portion of his business.  That being said, he

provided investment clients with documents on Pinnacle letterhead and deposited their money

into Pinnacle bank accounts.  *See* PSR at 6.

*Ariel Castillo and the Colemans*

---

[2] In addition to this criminal case, the Attorney General for the Commonwealth of Massachusetts filed suit, and obtained an injunction, based primarily on Burton's improper collection of up-front fees in connection with the loan modification process in particular.  The March 2013 injunction also prevented him from advertising, receiving fees and/or providing bankruptcy petition preparation, legal advice, or investment advisory services.  Likewise, Burton has also been sued in bankruptcy court for the unauthorized practice of law in connection with his bankruptcy petition preparation services.  Although Burton is a graduate of the Massachusetts School of Law, he has never been admitted to any bar.  Thus, after holding a five-day bench trial, and hearing testimony from Burton and several Pinnacle employees, Judge Boroff issued a 101-page decision in which he found that Burton had engaged in the unauthorized practice of law and ordered that he disgorge fees charged to his bankruptcy petition preparation clients.  Judge Boroff also found that Burton's testimony was not credible.  *See* PSR at 5.

Ariel Castillo, who invested with Burton in 2007, and Larry and Miriam Coleman, who invested with Burton in 2011 and 2012, all viewed him as their investment advisor and believed that he was actually "managing" their money.  Castillo is a chaplain in the army and Larry Coleman is a pilot for USAirways.  *See* PSR at 6.

When Castillo met with Burton in early 2007, Burton described himself as a financial advisor at Deutsche Bank (which was not true – while he did work at Deutsche at one point, he worked in an administrative role) and offered to provide investment advising services to Castillo. Burton told Castillo that he would open an Individual Retirement Account with Castillo's $25,000, which, on Burton's direction, Castillo gave to Burton in cash.  Burton specifically told Castillo that he would invest Castillo's money in index funds and a diversified equities portfolio and provided Castillo with written and oral updates showing what stocks Castillo was allegedly invested in.  Burton also charged Castillo a fee of $2,500 for the investment advising services. Analysis of Burton's bank account establishes that Castillo's money was not invested in any securities.  Rather, it was simply spent as soon as it was deposited.  *See* PSR at 6.

Larry and Miriam Coleman also retained Burton as their investment advisor and also paid Burton for his investment advising services.  The Colemans initially came to Burton for assistance with a loan modification and later retained him for tax preparation and investment advising services as well.  At Burton's direction, in 2011, the Colemans withdrew a total of $98,000 from Larry Coleman's IRA and used some of it to pay down their mortgage (which Burton was unable to modify) and gave Burton another $40,000 for investment in "private equity."  In May 2012, the Colemans gave Burton another $35,000 for investment after Burton

assured them that their investments were doing well.  *See* PSR at 6–7.

Burton provided the Colemans with access to a web-site that showed their purported holdings in the "funds" identified in the indictment.  An April 2013 print-out from the web-site showed an account balance of $107,000 (suggesting that the Coleman's $75,000 investment had appreciated) and also showed that their funds were maintained in specific funds—Pinnacle Strategic Investments Ram 2100 Fund, the U.S. Currency Fund and the Pinnacle Debt Portfolio 2020.  But the Coleman's funds were never invested in anything.  Once again, Burton spent the Coleman's money as soon as it was deposited into his accounts.  *See* PSR at 7.

*Sean Hannan and Edward Vozella*

Sean Hannan, Burton's neighbor, and Edward Vozella, a tax client and friend, both made investments with Burton pursuant to Pinnacle Strategic Investments, LLC offering memoranda and promissory notes, which were signed by Burton.  As set forth in the documents provided to both Hannan and Vozella, Burton represented that their money ($40,000 for Hannan and $25,000 for Vozella) was to be invested in a "debt portfolio."   In the promissory notes and offering memoranda, Burton also promised that Hannan's and Vozella's investments would be repaid, along with 100% interest, within 30 days.  Indeed, prior to his investment, Burton solicited Hannan relatively mercilessly via text message and, among other things, told Hannan that he would personally "guarantee" the investment.  Also prior to investing, Hannan submitted a series of written questions, to which Burton responded.  In his written responses, Burton again promised that Hannan's investment, plus interest, would be returned within 30 days.  *See* PSR at 7.

Burton did not return any money to either Hannan or Vozella within 30 days.  Then, after the 30 day window had passed, Burton gave each of them a series of checks that bounced. Vozella later learned that the bank account on which the bounced checks were drawn was closed before Burton even gave him the checks.  Moreover, according to the bank records, Burton did not invest any of Hannan's or Vozella's money.  Rather, their money was simply withdrawn from the account into which Burton deposited it.  *See* PSR at 7.

*Loss and Restitution*

Burton did not return any of Castillo's $25,000, the Colemans' $75,000, or Vozella's $25,000.  Burton did return $5,500 of Hannan's $40,000 investment, reducing Hannan's loss to $34,500.  Accordingly, the total loss attributable to Burton on the fraud claims was $159,500, which Burton also was ordered to repay as restitution.  *See* PSR at 10.

As part of the original plea agreement in this case, Burton was obligated to make an initial restitution payment of $50,000 before sentencing.  Dkt No. 84.  He did not do that, resulting in the breach and nullification of that agreement.  As part of the judgment in this case, the Court Ordered that Burton make an initial restitution payment of $50,000 by January 19, 2015.  Dkt. No. 125.  He did not do that.  On January 17, 2017, at the same time the Court directed the government to respond to the Section 2255 Petition, the Court issued another Order directing Burton to make the $50,000 payment by February 13, 2017.  He has not made the payment.

B. <u>Tax Charges</u>

As set forth above, the tax charges fall into two categories—charges based on Burton's preparation of false returns for two of his clients, the Colemans and Ramon and Brenda Tejada, as well as the filing of his own false returns for four years.  The Section 2255 Petition does not appear to focus on the tax charges, which are discussed in abbreviated form here.  Specifically, although both the Tejadas and the Colemans provided Burton with accurate information about their income, Burton prepared and filed false tax returns on their behalf.  Then, when the Tejadas became subject to the inevitable audit from the Internal Revenue Service, Burton prepared and filed amended returns without their permission and by forging their signatures. *See* PSR at 7–8.

With respect to his own returns, Burton underreported income he received from his business and falsely claimed two dependents—his nephews—neither of whom were living with him during 2010 or 2011.  As a result, Burton avoided paying approximately $150,000 in taxes during that same time frame.  Then, after being interviewed by Special Agents from IRS-CI, Burton filed amended tax returns for 2010 and 2011, both of which included corrected income figures.  Burton also removed the dependents from those returns and no longer claimed the earned income tax credit.  Burton did not amend his returns for 2008 and 2009, nor did he pay the taxes due and owing for tax years 2010 and 2011. *See* PSR at 8–9.

## II.    **Procedural History**

On August 21, 2014, Burton pleaded guilty to all counts in the Second Superseding Indictment charging him with securities fraud, in violation of 15 U.S.C. §§78j(b) & 78ff and 17 C.F.R. §240.10-b5, procuring false tax returns, in violation of 26 U.S.C. §7206(2), and

8

subscribing false tax returns, in violation of 26 U.S.C. §7206(1). *See* Plea Hearing Transcript, Dkt. No. 172 at 25. Although Burton initially pleaded guilty to the charges pursuant to a plea agreement with the government made pursuant to Fed. R. Crim. P. 11(c)(1)(C), by the time of sentencing the government argued that Burton had breached the agreement—by failing to make an agreed-upon restitution payment.  The Court, therefore, provided the defendant with the opportunity to withdraw his plea.  *See* Sentencing Hearing Transcript, Dkt. No. 173 at 8. The defendant chose not to do that and was sentenced to 48 months in prison, to be followed by three years of supervised release.  As a term of his supervised release, the defendant was ordered to pay 25% of his future earnings towards restitution and was further ordered to pay restitution in the amount of $271,640 to the Internal Revenue Service.  The defendant also was ordered to pay restitution in the amount of $159,500 to five victims identified in the Judgment and was ordered to pay $50,000 towards his restitution obligations by January 19, 2015.  *See* Dkt. No. 125.  The defendant has not made any restitution payments.

Following his guilty plea, the defendant filed numerous motions, including but not limited to, a motion to vacate a portion of his sentence, a notice of appeal, motions for discovery, and a variety of motions and memoranda referencing 28 U.S.C. §2255.  *See* Dkt. Nos. 126-167. The notice of appeal was filed on April 20, 2015.  *See* Dkt. No. 131; *see United States v. Burton*, 15-1578 (1st Cir).  Burton did not initially pursue the appeal, but eventually his counsel filed a motion to enlarge the time for Burton to file a docketing statement in the First Circuit and also moved to withdraw.  Burton himself continued to file motions in this Court seeking various types

of relief and filed two motions to dismiss the appeal. The First Circuit therefore did dismiss the appeal.

As set forth above, and following the dismissal of the appeal, this Court issued an Order directing the government to respond to Burton's second Motion to Vacate, Dkt. No. 137 and also the issue raised in Burton's Motion to Amend Sentence and Correct Restitution Amount, Dkt. No. 162, treating the Motion to Amend as if it were a Motion to Amend his Motion to Vacate.[3]

As also set forth above, the first nine claims in Burton's Motion to Vacate relate to claims of ineffective assistance of counsel. Accordingly, the government moved for an Order Regarding Waiver of Attorney-Client Privilege in which the government asked that the Court find that Burton had waived his privilege or conduct a colloquy with Burton before finding such a waiver. Following receipt of the government's Motion, Burton filed, *pro se*, a waiver of the privilege. Dkt. No. 175. The government has since been in contact with defense counsel, Oscar Cruz, Esq., who has advised that he does not feel that he can rely on Burton's *pro se* waiver. As a result, the government cannot respond fully to all of the ineffective assistance of counsel claims.[4]

---

[3] Burton filed a Memorandum of Law in Support of his Motion to Vacate, Dkt. No. 139, and recently filed a Supplemental Memorandum, Dkt. No. 180, in which he repeats the arguments in his initial Memorandum and those made in his Motion to Amend.

[4] The government has filed a Motion to Conduct Colloquy of Defendant Regarding Waiver of Attorney-Client Privilege, Dkt. No. 182, which Motion is accompanied by an Affidavit from defense counsel.

**Legal Analysis and Argument**

As set forth above, this Opposition addresses Grounds Ten through Sixteen of the Section 2255 Petition and the issue raised in Burton's Motion to Amend, as well as certain of the ineffective assistance of counsel claims that appear facially invalid, especially when considered in light of the documents Burton has submitted in connection with these proceedings.

## I.     Legal Framework

Several concepts apply to the claims asserted in Burton's Motion to Amend as well as in Grounds Ten through Sixteen of Burton's Section 2255 Petition.  First, by willingly entering into a guilty plea, Burton waived the right to collaterally attack his conviction.  Second, Burton's failure to raise any of these claims on direct appeal renders them procedurally defaulted, and they may not be raised in a Section 2255 petition.  Finally, because Burton is foreclosed from raising any of these claims in collateral review, he is not entitled to an evidentiary hearing.

### A.  By Pleading Guilty, Burton Has Waived His Right to Collaterally Attack His Convictions

A guilty plea, made voluntarily and intelligently, may not be collaterally attacked.  *See Bousley v. United States*, 523 U.S. 614, 621 (1998).  Indeed, the interests of finality are of special concern when a "conviction arises from a guilty plea."  *See United States v. George*, 676 F.3d 249, 257 (1st Cir. 2012) (citing *Bousley*, 523 U.S. at 621).  And because habeas review is not intended to be a substitute for an appeal, the "voluntariness and intelligence of a guilty plea can be attacked on collateral review *only if first challenged on direct review*," *Bousley*, 523 U.S. at 621 (emphasis added).

Moreover, even when challenged on direct appeal, a guilty plea implicates due process concerns (and is not voluntary and intelligent) only when the government has engaged in "some particularly pernicious form of impermissible conduct," *Ferrara v. United States*, 456 F.3d 278, 291 (1st Cir. 2006) (citing *Brady v. United States*, 397 U.S. 742, 757 (1970)), and when that impermissible conduct caused a defendant to plead guilty, *see Wilkins v. United States*, 754 F.3d 24, 28 (1st Cir. 2014).  If misconduct involves new evidence that was not previously disclosed, a petitioner must show that the evidence likely would have changed the outcome of a trial. *See Wilkins*, 754 F.3d at 28 (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

B.  *Burton's Claims are Procedurally Defaulted*

If a petitioner does not raise a claim at trial or on direct appeal, that claim is procedurally defaulted, and "a significant bar on habeas corpus relief is imposed."  *Owens v. United States*, 483 F.3d 48, 56–57 (1st Cir. 2007); *see also Oakes v. United States*, 400 F.3d 92, 95 (1st Cir. 2005) ("If a federal habeas petitioner challenges his conviction or sentence on a ground that he did not advance on direct appeal, his claim is deemed procedurally defaulted.").  There are only two narrow exceptions to the prohibition on raising procedurally defaulted claims on habeas corpus review: the defendant must show either (1) cause and actual prejudice, or (2) actual innocence. *See Bousley*, 523 U.S. at 622.

Under the first exception, a defaulted claim can be heard "only if the petitioner has 'cause' for having procedurally defaulted his claims" and the alleged error caused "actual prejudice." *Oakes*, 400 F.3d at 95. To establish cause, the petitioner must show "that some external impediment, such as government interference or the reasonable unavailability of the factual or

legal basis for the claim, prevented it from being raised earlier." *Oliver v. United States*, 2010 WL 2612738, at *3 (D. Mass. 2010) (quoting *Andiarena v. United States*, 967 F.2d 715, 718 (1st Cir. 1992). To establish actual prejudice, the petitioner must show that the alleged error had a "substantial and injurious effect." *Sustache-Rivera v. United States*, 221 F.3d 8, 18 (1st Cir. 2000); *see also DeCato v. United States*, 51 F. App'x 888, 891 (1st Cir. 2002) (finding no actual prejudice on collateral review of guilty plea because it was "inconceivable that a jury would have failed to agree unanimously" to convict).

Under the second exception, a defaulted claim can be heard if the petitioner can demonstrate that he was "actually innocent"—that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)). This exception is "very narrow" and reserved for "truly exceptional cases." *Walker v. Russo*, 506 F.3d 19, 21 (1st Cir. 2007). Courts are even more reluctant to apply the actual innocence exception when a defendant has pleaded guilty. *See United States v. Dunfee*, 821 F.3d 120, 131–32 (1st Cir. 2016) (rejecting actual innocence claim based only on "conclusory allegations and wishful conjecture as to the possible existence of exculpatory evidence"); *Torres v. United States*, 2010 WL 147806, at *4 (D. Me. 2010) (rejecting a claim of actual innocence where defendant told court in plea hearing that he actually committed the crime).

### C.  Burton is Not Entitled to an Evidentiary Hearing

On a Section 2255 petition, the "petitioner bears the burden of establishing the need for an evidentiary hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993). That burden is heavy, and evidentiary hearings on Section 2255 petitions are the "exception, not the norm."

13

*Moreno-Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003). While a court reviewing a Section 2255 petition must take many of the petitioner's factual assertions as true, the court "need not give weight to conclusory allegations [or] self-interested characterizations." *See McGill*, 11 F.3d at 225. And, in general, for a hearing to be granted, "the [Section 2255] petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions," *United States v. Arias*, 94 F. Supp. 3d 93, 115–16 (D. Mass. 2015) (quoting *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006)), and the petitioner must be able to show that "the evidence at issue is favorable [to the petitioner]," *Owens*, 483 F.3d at 68 (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

## II.  This Court Should Dismiss Grounds Ten Through Sixteen of Burton's Section 2255 Petition and Refuse to Allow Burton to Amend His Petition

### A.  *There Was No Brady Violation (Ground Ten)*

In the tenth ground of his Section 2255 Petition, Burton claims that the government violated its *Brady* obligations by not disclosing the bank statements and other financial statements of four of Burton's victims. Def. Memo, Dkt. No. 139 at 21.  By pleading guilty, Burton waived his right to raise this claim and it also is procedurally defaulted.  Burton cannot prevail for the additional reason that the government did not have the documents Burton now contends would exculpate him and did not withhold anything from Burton.

Burton has waived this claim—and his right to receive materials under *Brady v. Maryland*, 373 U.S. 83 (1963)—by entering a guilty plea.  The Supreme Court has held that a prosecutor does not have to share "all useful information" with a defendant prior to entering a plea agreement with

14

a criminal defendant. *United States v. Ruiz*, 536 U.S. 622, 629 (2002).  And the First Circuit has declined to extend *Brady* to pretrial plea negotiations, finding that *Brady* is focused on trials, and that when a defendant "chooses to admit his guilt, *Brady* concerns subside." *United States v. Mathur*, 624 F.3d 498, 506–07 (1st Cir. 2010).  The transcripts of Burton's plea and sentencing hearings make clear that Burton acknowledged his own guilt. *See* Plea Hearing Transcript, Dkt. No. 172 at 14–20, 25; Sentencing Hearing Transcript, Dkt. No. 173 at 6–8.  By choosing to enter into a plea agreement, and by admitting his guilt, Burton has waived any *Brady* claims. And because Burton failed to challenge his guilty plea for lack of voluntariness or intelligence in a timely direct appeal, he cannot now challenge his plea. *See Bousley*, 523 U.S. at 621.

The claim also is procedurally defaulted.  If a petitioner does not raise a claim at trial or on direct appeal, that claim is procedurally defaulted. *Owens*, 483 F.3d at 56–57; *see also Oakes*, 400 F.3d 95.  Burton pleaded guilty without raising the government's purported *Brady* violations as an issue. He also did not raise the claim on direct appeal. The defendant's claim in Ground Ten is therefore procedurally defaulted.  And because Burton has not shown cause and prejudice for his failure to raise this claim on appeal, nor does his petition demonstrate that he is actually innocent, he is barred from raising this *Brady* claim on habeas review. *See Bousley*, 523 U.S. at 622.

Even if Burton was entitled to raise these claims in this proceeding, he cannot prevail because the government did not violate any *Brady* obligations. Under *Brady*, "the government is required to turn over exculpatory or impeachment evidence *in its possession* to the defendant." *United States v. Turner*, 501 F.3d 59, 73 (1st Cir. 2007) (emphasis added); *see also Lavallee v. Coplan*, 374 F.3d 41, 43 (1st Cir. 2004) ("Exculpatory . . . evidence is so-called '*Brady* material'

15

only if it is within the government's custody, possession, or control." (citing *United States v. Josleyn*, 206 F.3d 144, 151–53 (1st Cir. 2000))).  Here, the government exceeded the demands of *Brady*—it provided all the evidence in its possession to the defendant prior to his guilty plea. The government was never in possession of the purported bank statements or other financial statements that Burton alleges in Ground Ten, and thus the government had no *Brady* obligation to disclose them.

Burton is not entitled to an evidentiary hearing because his assertions state conclusions, not facts. Burton bears the heavy burden of establishing the need for an evidentiary hearing, and the Court "need not give weight to conclusory allegations or self-interested characterizations." *See McGill*, 11 F.3d at 225. Burton claims that the government "withheld evidence[,] such as the payments made" to some of his victims. Def. Memo., Dkt. No. 139 at 21.  He also claims that "the mere fact" that he never saw these purported payment histories demonstrates that the government withheld such evidence. *Id.*  However, these are conclusions that depend on the existence of facts— that the government had such evidence, or had an obligation to find such evidence; that the records even exist; that the records would show payments made by the defendant to his victims; and that the payments would be exculpatory. The defendant has not actually asserted these facts in any detail, nor has he outlined what the purported payment histories would show.

Accordingly, Burton has not met the minimum procedural requirements for an evidentiary hearing to be granted.  For a hearing to be granted, "the [Section 2255] petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Arias*, 94 F. Supp. 3d at 115–16

(quoting *Kafo*, 467 F.3d at 1067).  Burton's petition was not accompanied by a detailed affidavit specifying what the purported bank statements and other financial statements would contain or where they might be found.  Thus, he "cannot show that 'the evidence at issue is favorable to the accused.'" *Owens*, 483 F.3d at 68 (quoting *Strickler*, 527 U.S. at 281–82). Without such a showing, Burton has not met the heavy burden required for the court to grant him an evidentiary hearing on his Section 2255 Petition.

Indeed, as set forth above, *Burton's* bank statements make clear that he (1) did not invest and/or use his victim's money as promised and (2) did not pay them back.  Statements made and provided to the government by the victims, which were provided to Burton, further corroborate the latter.  In sum, in addition to being waived and procedurally defaulted, and in addition to resting on unsubstantiated allegations, the alleged *Brady* violation fails because the government did not withhold anything *and* the materials Burton now claims were withheld would not exculpate him. It is perhaps not surprising, therefore, that defense counsel—in an email conversation that Burton has attached to his filings—questioned the import of such documents in his defense at a trial or at sentencing.  *See* Dkt. No. 180, Exh. A (Dec. 2, 2014 Email from Oscar Cruz "I don't understand what these bank records will prove?  Rob admitted to the offense conduct and the loss amount is determined by summing up the amount of money that each 'investor' initially gave him.  Any arguments about money that may or may not have been paid go to the restitution amount.  Alleging that Coleman or any of the others are lying about monies being paid *is not a good strategy*.") (emphasis added).

*B.   There is No Newly Discovered Evidence (Ground Eleven and Motion to Amend)*

In the eleventh ground of his Section 2255 Petition, Burton asserts that "newly discovered evidence" from his sentencing hearing entitles him to a new sentencing hearing or to withdraw his guilty plea. In his Motion to Amend, Burton also cites analogous "newly discovered evidence" that, he claims, was "discovered" during the course of a "follow-on" proceeding initiated by the Securities and Exchange Commission ("SEC") following his convictions.  *See* Dkt. No. 162 at 2. In his Memoranda, and most recently his Supplemental Memorandum, Dkt. No. 180, Burton takes the opportunity to blame the government, casting the alleged withholding of this "newly discovered" evidence as prosecutorial misconduct.   A review of the *actual* record, however, demonstrates, definitively, that there is no newly discovered evidence and that Burton's allegations are entirely fabricated.

As an initial matter, both claims are waived by Burton's having voluntarily and intelligently entered a guilty plea.  And because Burton failed to challenge his guilty plea for lack of voluntariness or intelligence in a timely direct appeal, he cannot now challenge it on collateral review.  *See id.*   These claims also are procedurally defaulted, as Burton did not raise them on direct appeal. *See Owens*, 483 F.3d at 56–57; *see also Oakes*, 400 F.3d 95.  And because Burton has not shown cause and prejudice for his failure to raise these claims on appeal, nor does his petition demonstrate that he is actually innocent, he is barred from raising them on habeas review. *See Bousley*, 523 U.S. at 622.

That said, these claims fail for the additional reasons that there is no newly discovered evidence and there has been no misconduct.  The evidence Burton cites in support of Ground

Eleven consists of an alleged statement made by Larry Coleman—one of Burton's victims—at Burton's sentencing hearing. The defendant alleges that Coleman "informed the Court that certain monies received from Burton went to pay [Coleman's] mortgage." Def. Memo, Dkt. No. 139 at 23. The record establishes, however, that Coleman made no such statement. The transcripts from the sentencing hearing demonstrate that Coleman did not, at any point, state that he received money from Burton, nor did Coleman discuss spending such funds on a mortgage. *See* Sentencing Hearing Transcript, Dkt. No. 173 at 15–18. Burton has simply fabricated this claim.

He has done the same thing with the claim asserted in his Motion to Amend. In that Motion, Burton highlights a summary discussion in the SEC's "Order Instituting Administrative Proceedings" in which the SEC noted that "in connection with his guilty plea, Burton admitted that, between 2007 and June 2013, Burton, through Pinnacle, obtained not less than $150,000 from various investors by falsely representing that he would invest such monies on behalf of those investors." Exhibit A, Declaration of Rebecca Israel ("Israel Declaration" and attachments. The SEC document goes on to identify specific amounts invested by each of the investors, Castillo ($25,000), Coleman ($40,000), Hannan ($40,000) and Castillo ($25,000), but does not list *all* of the amounts invested by Coleman in particular.[5] Burton seizes on this omission to suggest that the SEC somehow had information that Burton stole less of Coleman's money than was represented to this Court. In fact, Burton represented in his Motion to Amend that "through the parallel proceeding with the Securities and Exchange Commission, Coleman has indicated that no fewer

_____

[5] As set forth above, after investing an initial $40,000 with Burton, Coleman gave Burton another $35,000. Burton returned none of that, leaving Coleman with a $75,000 loss. PSR at 23.

than $35,000 of the $75,000 was returned" and further states that he anticipated "similar testimony" to be offered by other victims at an upcoming hearing in the SEC case. Dkt. No. 162 at 2. That is simply not true. As set forth in the accompanying declaration of Rebecca Israel, the SEC Enforcement Counsel who handled the matter, the SEC obtained no additional statements and conducted no additional investigation in connection with its follow-on matter. Neither Coleman nor any other victim ever suggested that they lost anything less than what was established in the criminal case. Nor did "Israel [tell] Burton and [write] in her pleadings that the defendant was responsible for $99,500-$105,000 as a loss, not $159,500 as Walters alleged." Dkt. No. 180 at 3. A simple review of the SEC's document initiating its "follow-on" proceeding makes clear that Burton's accusations are fabricated and the Israel Declaration ends the analysis.

Even if the Court took it as true—against overwhelming evidence—that Coleman made such a statement at the sentencing hearing, or that the SEC somehow obtained evidence contrary to what the government presented at sentencing, these claims would still fail because a $35,000 reduction in Burton's loss amount would not result in a reduction in his sentence. As reflected in the PSR, the Guidelines calculation of Burton's sentence relating to his securities fraud convictions included an offense-level increase of ten levels based on a loss of $165,000. But as the Report also makes clear, the ten-level increase applies for *any* loss amount between $120,000 and $200,000. *See* PSR at 10; *see also* U.S. Sentencing Guidelines Manual § 2B1.1(b)(1) (U.S. Sentencing Comm'n 2014) (requiring an offense-level increase of ten for loss amounts above $120,000 but below $200,000). A reduction of Burton's loss of $165,000 by $35,000 would result

in a new loss of $130,000, well within the relevant range.[6] Therefore, even if Burton had repaid

$35,000 to Coleman—which he did not—there would be no change in his sentence.

Moreover, again taking it as true that the newly discovered evidence exists, Burton has not

met the standard required to obtain the new trial requested in his Section 2255 Petition. At a

minimum, in his Section 2255 Petition, Burton must "meet the conventional criteria for obtaining

a new trial on the ground of newly discovered evidence." *Barrett v. United States*, 965 F.2d 1184,

1194–95 (1st Cir. 1992) (leaving aside the question whether newly discovered evidence is a

"cognizable ground" for relief under 28 U.S.C. §2255). Those criteria consist of four elements: (1)

the newly discovered evidence was unknown or unavailable at the time of trial; (2) the defendant

was duly diligent in trying to discover it; (3) the evidence was material; and (4) the evidence was

such that it would probably result in an acquittal upon retrial. *Awon v. United States*, 308 F.3d 133,

140 (1st Cir. 2002); *see also United States v. Salcedo*, 1995 WL 73347, at *1 (D.N.H. 1995)

(applying newly discovered evidence test to defendant seeking to withdraw guilty plea pursuant to

28 U.S.C. §2255). Burton fails to satisfy elements two, three, and four.

Burton alleges in his Section 2255 Petition that he knew the victim had received some

funds. But he does not allege that he made a diligent attempt to discover where those funds had

gone or what they had been used for. The mere fact that it did not occur to a defendant to look into

---

[6] The 165,000 loss attributed to Burton in the PSR does not deduct the $5,500 that Burton returned to Hannan, which the PSR does deduct from the applicable restitution. *See* PSR at 10, 23.  That said, even if the loss attributed to Burton was lowered to $159,500, and even if— contrary to the evidence—Coleman's loss was reduced by $35,000, Burtown would still be accountable for a loss of $124,500, which results in the same 10-level adjustment under USSG §2B1.1.

something does not mean that the defendant was duly diligent, *see Awon*, 308 F.3d at 140, and by making no effort to learn more about the victim's use of funds, Burton did not demonstrate the due diligence necessary to satisfy element two.

Burton's purported evidence is also immaterial and would not have resulted in an acquittal upon trial. New evidence is material if it has the potential "to alter the outcome of the lawsuit under the applicable legal tenets." *United States v. Hernandez-Rodriguez*, 443 F.3d 138, 145 (1st Cir. 2006) (quoting *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 253 (1st Cir. 1996)). Even if the evidenced purported to exist did in fact exist, it would not go to the elements of securities fraud; at most it would change the loss attributable to Burton.  Nor is there a "reasonable probability that [a] jury would have acquitted" the defendant, had the evidence been known at a trial. Therefore, elements three and four are not met. Because Burton does not meet the elements required to obtain a new trial, his newly discovered evidence claim fails.

Finally, the eleventh ground of Burton's Section 2255 Petition also alleges that the only reason this "evidence" was not discovered was because his trial counsel was ineffective.  Even absent testimony from defense counsel, the Court can conclude that this claim has no merit. The transcript of the Sentencing Hearing and the SEC documents clearly demonstrate that Coleman never made a statement like that alleged by Burton, *see* Sentencing Hearing Transcript, Dkt. No. 173 at 15–18, and the SEC did not obtain evidence that was any different from that provided to the defendant and the Court in connection with the criminal case.  *See* Exhibit A.  Accordingly, there was no evidence for Burton's trial counsel to discover.

C.  *There Were No Procedural Deficiencies at the Plea and Sentencing Hearings (Grounds Twelve Through Sixteen)*

Grounds Twelve through Sixteen of Burton's Section 2255 Petition allege various procedural deficiencies during Burton's plea and sentencing hearings as well as in the final sentencing decision. The alleged deficiencies include: failure by the court to inform Burton of his maximum penalties; failure by the court to confirm that Burton had read and understood the presentence investigation report; abuse of discretion by the court in sentencing Burton to an above-Guidelines sentence and failing to explain the reasons for doing so; and failure by the court to provide sufficient notice to Burton that it would reject his plea agreement. These grounds all fail because they are procedurally defaulted and the transcripts from the hearings clearly show no error.

Burton did not raise any of the claims on direct appeal, and they are procedurally defaulted. *See Oakes*, 400 F.3d at 95. The defendant now attempts to overcome his default by arguing that he is "actually innocent," and he urges the Court to hold an evidentiary hearing. In order for the "actual innocence exception" to apply, however, Burton must show that evidence exists sufficient to outweigh the considerable record against him, such that "it is *more likely than not* that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup*, 513 U.S. at 327–28) (emphasis added).

Burton does not, in grounds twelve through sixteen, set forth any facts. Burton *does* lay out some facts in grounds one through eleven. Many of these relate to his ineffective assistance of counsel claims.  Burton also alleges the existence of, among other things: certain bank statements that purportedly show that he partially paid one of his victims back; various purported

misrepresentations by a witness at trial; and purported conversations between himself and some of his clients.  Even if all of these facts were true, Burton would still not meet the narrow actual innocence standard. Indeed, it is more likely than not that a reasonable juror *would* have convicted him based on all the evidence. That evidence clearly demonstrates that the defendant defrauded investors; spent his victims' money for his own personal gain; misled his victims as to the status of their investments; and falsified tax returns. In similar cases where the evidence is so substantial that guilt is clear, the First Circuit has rejected claims of "actual innocence." *See, e.g.*, *Simpson v. Matesanz*, 175 F.3d 200, 210 (1st Cir. 1999) (declining to apply actual innocence exception in murder case where substantial evidence demonstrated defendant's guilt).

The fact that Burton pleaded guilty weighs even more heavily against his actual innocence claim. Most courts have rejected claims of actual innocence where a defendant has pleaded guilty, s*ee, e.g.*, *Dunfee*, 821 F.3d at 131–32; *Torres*, 2010 WL 147806, at *2–4, and considered it highly probative that a defendant "declared under oath at a properly conducted Rule 11 hearing that he was guilty of the crimes with which he was charged," *Dunfee*, 821 F.3d at 128. There can be no dispute that this Court conducted a thorough colloquy and that under oath, Burton admitted his guilt to each and every one of the eleven crimes with which he was charged. *See* Plea Hearing Transcript, Dkt. No. 172 at 14–20, 25.  Burton's claim of actual innocence, therefore, should be rejected by this Court.

In addition, this Court should reject Burton's request for an evidentiary hearing to attempt to prove his actual innocence. As with the rest of his claims, the defendant must satisfy a heavy burden to establish the need for an evidentiary hearing. *See McGill*, 11 F.3d at 225. Burton has not

24

asserted any facts that would render it more likely than not that no reasonable juror would have convicted him. Nor has he submitted a detailed and specific affidavit showing that he has any actual proof of his allegations, as is required before an evidentiary hearing is granted. *See Arias*, 94 F. Supp. 3d at 115–16.   Because he has not asserted any facts that would satisfy the stringent actual innocence standard, the defendant should not be granted an evidentiary hearing.

Even if Burton's claims in Grounds Twelve through Sixteen were not procedurally defaulted, the transcripts from his hearings clearly demonstrate that no errors occurred. Ground Twelve alleges that the Court failed to inform Burton of the maximum possible penalties, in violation of Fed. R. Crim. P. 11(b)(1)(H). This is false. The transcript of the plea hearing shows that this Court informed Burton of the maximum possible penalties for Counts One through Five, Plea Hearing Transcript, Dkt. No. 172 at 8–9, as well as for Counts Six through Eleven, *id.* at 9.

Ground Thirteen alleges that the Court failed to confirm that Burton had read the presentence investigation report, in violation of Fed. R. Crim. P. 32(i)(1)(A). This is also false. At the sentencing hearing, this Court inquired as to whether Burton and his trial counsel had read the Presentence Report. Burton responded that he had read the report and that nothing in the report was inaccurate. *See* Sentencing Hearing Transcript, Dkt. No. 173 at 9–10.

Ground Fourteen alleges that the Court abused its discretion by sentencing Burton to a higher sentence than the U.S. Sentencing Guidelines range, in violation of 18 U.S.C. §3553(b). Ground Fifteen alleges that the Court did not specifically state reasons for its upward departure from the Guidelines sentence. Once again, these claims are false. The Court was well within its discretion to sentence Burton to forty-eight months, above his Guidelines range of thirty-seven to

25

forty-six months. At the sentencing hearing, this Court explicitly informed Burton that the Guidelines range is merely a "starting point and initial benchmark" and that a higher or lower sentence could be imposed. *Id.* at 8. The Court went on to state that it would have to explain its reasoning for any departure from the Guidelines range. *Id.* at 8–9. After hearing from Burton's victims, this Court imposed its sentence of forty-eight months, two months above the Guidelines range. The Court specifically explained that "[t]he sentence is higher than the guideline range" because "it's [the Court's] statutory obligation to impose the sentence that's minimally sufficient . . . to serve the purposes of sentencing," and because the sentence was necessary to "protect the public and to send [Burton] a message." *Id.* at 42–43.

Ground Sixteen alleges that the Court failed to provide sufficient notice to Burton that it would reject his binding plea agreement.  To the contrary, Burton knew well before his sentencing hearing that the Court might reject the plea agreement. *See* Plea Hearing Transcript, Dkt. No. 172 at 25 ("[The Court is] deferring until the sentencing hearing whether to accept the plea agreement and impose the agreed upon sentence."). After the plea hearing, Burton violated the terms of his plea agreement. The government informed him that it would advise the Court to reject the plea agreement, and filed a supplementary sentencing memorandum with the Court doing so. Government's Supplemental Sentencing Memorandum, Dkt. No. 120 at 6–7. At that point, Mr. Burton agreed that he was in breach of the agreement. Defendant's Sentencing Memorandum, Dkt. No. 119 at 6. At the beginning of Burton's sentencing hearing, the Court informed Burton that it would reject the plea agreement and that it may give him a sentence much higher than that outlined in the plea agreement. *Id.* at 7. Before proceeding with sentencing, the Court gave Burton an

26

opportunity to withdraw his guilty plea. *Id.* Burton acknowledged the Court's statements, indicated that he and his trial counsel had discussed—prior to the sentencing hearing—the Court's potential rejection of his plea agreement, and told the Court that he did not wish to withdraw his guilty plea. *Id.* at 7–8. Burton did not ask the Court for more time to consider whether he should withdraw the plea. Burton, then, had sufficient notice that his plea would be rejected and had discussed the matter with his counsel. Ground Sixteen should therefore be rejected.

### III.     Certain of Burton's Ineffective Assistance of Counsel Claims are Facially Invalid

As noted, the government does not have full information regarding the discussions between Burton and his defense counsel and therefore is not in a position to fully respond to all of Burton's claims.   That said, the documents Burton himself has submitted in connection with these proceedings demonstrate that at least several of the claims have no merit.

First, in Ground One, Burton claims that his counsel was ineffective because counsel had "misinformed him that he could not withdraw his guilty plea." Dkt. No. 137 at 4. In an email attached to Burton's Supplemental Memorandum, however, defense counsel specifically advises that Burton may withdraw his guilty plea. *See* Dkt. No. 180, Exhibit A (Dec. 16, 2014 Email from Oscar Cruz, citing Fed. R. Crim. P. 11(d)(1) which provides that a defendant may withdraw his guilty plea before the Court accepts the plea and stating "I can notice the Court that Robert is withdrawing his guilty plea because under 11(c)(1)(C) (binding plea agreement provision), the judge has yet to 'accept it.'").   And then, of course, the Court also informed Burton, on the record, of his ability to withdraw his plea.

In Ground Four, Burton complains that his counsel was ineffective in failing to request, investigate and review the victims' bank statements.  Dkt. 137 at 4.  Again, it is clear from the emails submitted by Burton that defense counsel specifically considered this issue and made the *strategic* decision not to pursue further investigation of the statements.  *See* Dkt. No. 180, Exh. A (Dec. 2, 2014 Email from Oscar Cruz "I don't understand what these bank records will prove?  Rob admitted to the offense conduct and the loss amount is determined by summing up the amount of money that each 'investor' initially gave him.  Any arguments about money that may or may not have been paid go to the restitution amount.  Alleging that Coleman or any of the others are lying about monies being paid *is not a good strategy*.") (emphasis added).  Such a reasoned, strategic decision made by counsel, of course, cannot serve as the basis of an ineffective assistance claim.  *See Cepulonis v. Ponte*, 699 F.2d 573, 575 (1st Cir. 1983) ("[C]ounsel need not chase wild factual geese when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial as a matter of law, or, as here, as a matter of fact and of the realities of proof, procedure, and trial tactics.").

In Ground Six, Burton claims that counsel was ineffective in failing to discuss and review the presentence report.  Dkt. No. 137 at 4.  Burton told the Court otherwise at the sentencing hearing. *See* Sentencing Hearing Transcript, Dkt. No. 173 at 9–10.

In Ground Eight, Burton claims that counsel was ineffective in failing to withdraw from representing Burton after discovering that he would be called as a witness against Burton.  Dkt. No. 137 at 4.  Again, Burton's emails show that counsel raised this precise issue with Burton prior to the sentencing hearing, because it appears that Burton's third-party custodian had contacted

28

defense counsel regarding misconduct by Burton.  Dkt. No. 180, Exh. A (Dec. 16, 2014 Email from Oscar Cruz discussing possibility of withdrawing given differing opinions on legal strategy and potential issue with Burton's third-party custodian).

In short, while the government does not have sufficient information to respond fully to all of Burton's ineffective assistance of counsel claims, it is clear that many are without merit.

## Conclusion

For the foregoing reasons, the government respectfully requests that the Court dismiss Grounds One, Four, Six, and Eight (certain of the ineffective assistance claims) and dismiss claims Ten through Sixteen.  In addition, the government respectfully requests that the Court DENY Burton's efforts to amend his Section 2255 Petition to include a claim based on purportedly newly discovered evidence uncovered in the SEC follow-on proceeding, which purported evidence does not exist.

Respectfully submitted,

WILLIAM D. WEINREB
Acting U.S. Attorney


By:     */s/ Sarah E. Walters*
Sarah E. Walters
Assistant U.S. Attorney

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). A copy of this document also has been sent, by first class mail, to Robert Burton at the following address:

    Robert Burton, #95502-038
    FMC Devens
    FEDERAL MEDICAL CENTER
    P.O. BOX 879
    AYER, MA  01432

Dated: April 20, 2017

                       */s/ Sarah E. Walters*
                       SARAH E. WALTERS