UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                    ) | Criminal No.:  13-10292-MLW |
| ) | |
| ROBERT BURTON,              ) | |
| ) | |
| Defendant.              ) | |
| _____ ) | |

## GOVERNMENT'S SENTENCING MEMO

The government respectfully submits this memorandum in connection with the sentencing of defendant Robert Burton for violating the conditions of his supervised release by failing to pay restitution.

We do not arrive at this sentencing on a blank slate.  In 2016, when the Court sentenced the defendant to an above-Guidelines term of four years in prison for his underlying securities and tax fraud convictions, it noted its concern that the sentence was "too low," adding:  "As far as I'm concerned, you're an eloquent, thorough fraud."  Dkt. 173 at 40 (sentencing transcript).  And it noted:  "I don't believe that if you were out that you would work industriously to pay back [your victims]."  *Id*. at 43.

The Court's comments proved prescient.  As set forth below, Burton returned to a life of fraud immediately upon his release from prison in early 2018, and his lies—to the Court and to new victims—have continued in various forms since then.  He is unrepentant and undeterred, defiant of Court authority and a danger to the community.  He has no intention of paying meaningful restitution to his victims.

As set forth in the Probation Department's Violation Report, the applicable sentencing guidelines range is between four and ten months and the statutory maximum term of incarceration is two years. For the reasons set forth below, the government recommends that the Court sentence Burton to a term of two years in prison, to be followed by one year of supervised release.[1]

**Background**

A. Burton's Underlying Convictions

On August 21, 2014, Burton, pleaded guilty to securities fraud, in violation of 15 U.S.C. §§78j(b) & 78ff and 17 C.F.R. §240.10-b5, procuring false tax returns, in violation of 26 U.S.C. §7206(2), and subscribing false tax returns, in violation of 26 U.S.C. §7206(1). Dkt. No. 172 (plea hearing transcript) at 25. Prior to sentencing, Burton breached the plea agreement by failing to make an agreed-upon restitution payment. Dkt. No. 173 (sentencing hearing transcript) at 8. He

---

[1] The government intends to rely, for sentencing purposes, on the exhibits it has previously submitted to the Court and those that are appended hereto, and does not intend to call additional witnesses at the sentencing hearing other than as necessary to rebut testimony by defense witnesses. The exhibits, which consist principally of emails, other documents (including court, Probation Department and Bureau of Prisons records), and audio recordings, are admissible for purposes of these proceedings. *See, e.g., United States v. Bueno-Beltran*, 857 F.3d 65, 67–68 (1st Cir. 2017) (noting that "the Federal Rules of Evidence do not apply to revocation proceedings, and revocation proceedings should be flexible enough to consider evidence including letter affidavits, and other material that would not be admissible in an adversary criminal trial") (citations and internal quotation marks omitted); *United States v. Marino*, 833 F.3d 1, 5 (1st Cir. 2016) ("conventional substitutes for live testimony, like affidavits, depositions, and documentary evidence, ordinarily possess sufficient indicia of reliability" to be admitted at revocation proceedings) (citation and internal quotation marks omitted).

The defendant has admitted violating the conditions of his release by failing to pay restitution, and further admitted, in his Trial Brief, essentially all of the material facts relevant to the other conduct described in the Violation Report and set forth herein. His principal dispute is that the additional conduct violated of the conditions of his release, or that he was on notice of that fact. The government has previously addressed those contentions. Regardless of whether the defendant's additional conduct violated his release conditions, however, it remains relevant to the Court's consideration of the pertinent factors under Title 18, United States Code, Section 3553(a), as set forth below.

was ultimately sentenced to 48 months in prison, to be followed by three years of supervised release.  As a condition of his supervised release, Burton was ordered to pay restitution of $159,500 to five victims, including $50,000 due January 19, 2015, and he was further ordered to pay restitution of $271,640 to the Internal Revenue Service.  Dkt. No. 125.[2]

### B.   Burton's Violation of His Supervised Release

On or about October 2, 2020, Burton admitted that he violated the conditions of his supervised release by failing to pay restitution.  Dkt. 299.  Burton's restitution payments to date total just $3,349.98, and he made his last monthly payment of $450 one year ago, in October 2019. *See* Government Sentencing Exhibit ("GSX") 53.  Burton made no payments between May and September 2019, *id.*, though he reported to the IRS that he earned nearly $70,000 in that year (and, as set forth below, his wife earned a comparable amount).  *See* GSX 55.  In March 2020, the IRS temporarily closed its collection case against him based on its conclusion that he did not have the ability to pay the money he owes.  *See* Dkt. 303.

### C.   Burton's Fraud on Three Successive Landlords

Burton was released from prison to a residential reentry facility on or about December 18, 2017.  On or about January 30, 2018, he was released from the residential reentry facility to serve the final two months of his prison sentence on home confinement.[3]

On or about March 8, 2018, three weeks before his home confinement period expired, Burton submitted an application to lease a two-bedroom duplex penthouse with a terrace at

---

[2] Burton subsequently filed an appeal, which he withdrew, and continued to file numerous requests to amend his sentence and restitution order, as well as two Motions to Vacate, Set Aside or Correct Sentence, Pursuant to 28 U.S.C. §2255.

[3] Even before his release, Burton was found to have violated prison rules on two occasions, including in one instance by possessing an illicit cell phone.  *See* Ex. A (prison disciplinary record), attached hereto.

Harborview at the Navy Yard, a waterfront apartment complex in Charlestown, MA. *See* Ex. B (Harborview application); Ex. C (penthouse floorplan), attached hereto. He listed his occupation as managing partner of Bear Atlas Ventures, with a start date of June 1, 2006, and a salary of $29,583.33. *See* Ex. B at 4. According to documents Burton filed with the Court in connection with this proceeding, however, Bear Atlas Ventures was incorporated just one week earlier, on March 1, 2018. *See* Defense Sentencing Ex. ("DSX") 98 (articles of incorporation). And according to information Burton provided to the Probation Department at the time of his pre-sentence interview, the business was in its "early stages" as of late 2014, shortly before Burton was incarcerated. *See* Pre-Sentence Investigation Report ("PSR") ¶ 95.

Burton's rent at Harborview was $5,573 per month (including a $250 per month parking space)—an amount that exceeded his wife's gross annual income. *See* Ex. D (lease); Ex. E (Tiesha Burton paystub), attached hereto. Over the next three months, as set forth below, Burton paid the rent in part by using a $25,000 investment in his start-up car wash business from Keith Pinson, a convicted felon, and by using a credit card belonging to Pinson. *See* GSX 34; *see also* Ex. F (credit card statement), attached hereto. By July, having spent Pinson's investment and maxed out his credit cards, Burton was behind on the rent. *See* GSX 35-1. He vacated the unit at the end of September, leaving more than $10,000 in rent unpaid. *See* GSX 35-2.

In September, Burton applied to rent another apartment in Charlestown. On his application, Burton falsely listed his salary as $300,000 and answered "no" when asked whether he was a convicted felon. *See* GSX 36. Burton occupied the apartment as of October 1, 2018. By December, he had failed to pay his rent and accused the landlord of not providing adequate heat. *See* GSX 39 at 4 (Burton complaint and motion for temporary restraining order). On or about January 7, 2019, an attorney representing Burton's landlord sent Burton a notice to quit.

DSX 95 at 3-7.  The following day, Burton filed the first of several complaints with the City of Boston Department of Inspectional Services concerning the purported lack of heat in the apartment.  *Id.* at 8; *see also* GSX 92; GSX 39 at 4.  Later that month, Burton demanded that the landlord pay him to vacate the apartment.  *See* GSX 37 at 3.  On or about February 15, Burton called the City of Boston Police Department to report that the landlord's daughter, who was at the apartment with a heating repairman, "was making condescending comments, called him a liar, [and was] rude, aggressive, discriminating against him and told him that she's got something coming for him."  GSX 38-1.[4]  On or about February 19, Burton denied the landlord's heating repairman access to the apartment, and filed a lawsuit seeking to recover three times his monthly rent, plus costs, on the basis of a variety of purported defects and maintenance issues, including the lack of heat.  GSX 39; DSX 95 at 12.[5]  In March, Burton warned the landlord:  "I suggest your plumbers arrive bright and early tomorrow.  The clock is ticking and I hope they can find a solution to this problem. . . .  Coincidentally, there will be a Massachusetts state lead paint inspector at the property again tomorrow.  Your plumbers will need to delead the unit before making any repairs or it will be considered unauthorized deleading.  Please provide a plan to me addressing our relocation during this process."  GSX 43 at 2.[6]  That same day, Burton emailed the City of Boston to demand that it pursue the landlord "for failure to provide the statutory required heat to this unit."

---

[4] Two days later, the landlord called the police to report that she feared Burton and believed he was extorting her.  *See* GSX 38-2.

[5] On or about February 20, 2019 the repairman replaced a thermostat.  DSX 95 at 14.  On or about February 26, the repairman was once again denied access to the apartment.  DSX 95 at 13.  That same day, the Housing Court appears to have granted Burton a temporary restraining order.  GSX 41 (temporary restraining order).

[6] Burton purports to operate a lead paint remediation company.  *See* DSX 91; 97.

GSX 42.  On or about March 15, 2019, Burton agreed to vacate the apartment in exchange for a payment from the landlord of $2,500.  GSX 44.

While battling the second Charlestown landlord, Burton applied to rent an apartment in Somerville, Massachusetts.  *See* GSX 45-1.  On the application, he falsely listed his salary from Bear Atlas Ventures as $200,000, and attached falsified Bear Atlas pay stubs in support of the application.  *See id.*; GSX 45-2.  Once again, no sooner had Burton moved in, then he promptly failed to pay his rent for the month of April.  On April 4, he notified his landlord that he would send his rent on "the first Friday of each month," explaining:  "I operate my own firm and my income is derived from several businesses I manage.  Each month my management fee is different and it takes about 3 days to calculate everything."  GSX 46 at 1.  Two days later, when the landlord inquired why the bank had placed a hold on the rent payment, Burton responded:  "Only your bank can answer that question with respect to the hold."  *Id*. at 2.  He added:  "[N]o need to CC my wife on these emails."  *Id*.  Ultimately, Bank of America advised the landlord that it had placed a hold on Burton's payment because "the deposit for March rent was initially declined due to insufficient fund[s] in the account."  *Id*. at 3.  Burton replied, falsely:  "The information you received was incorrect. . . .  There was no 'insufficient funds' issue.  This account has a monthly balance of $100K at all times."  GSX 47.  He added, falsely:  "Because of my schedule, I do not always make these types of deposits personally.  Many times, my assistant is sent out to do something like this."  *Id.*

In May, after Burton's landlord once again inquired about his failure to pay rent, Burton emailed the following:  "I understand you spoke with my wife today about the rent?  Without sharing our family dynamics, Tiesha is not privy to any of finances of my family.  I handle all the finances and any questions you may have MUST be directed to me, as I've requested last month."

GSX 48.  He added:  "The rent payment was actually processed May 2 at 3:11am est through my accounts.  Please allow processing time for the funds to clear."  *Id.*

In fact, Burton's contention that he had paid the May rent was false.  On June 10, the landlord filed a complaint seeking to evict Burton for nonpayment of the May and June rent.  GSX 49.  Burton ultimately agreed to vacate the premises on or before August 31, and to pay the amounts he owed before then.  GSX 50.  Once again, Burton failed to do so.  *See* GSX 51 (noting that Burton paid May rent on June 18; June rent on June 20; but failed to pay July or August rent as of August 5).  On August 19, the Court entered a default judgment against him.  GSX 52.

D. Burton's Use of Pinson's Credit

As the government previously detailed in its response to Burton's trial brief, Dkt. 296, Burton agreed to sell shares in his start-up car wash business to Keith Pinson, a convicted felon, in April 2018, for $53,712.50.  *See* GSX 15-1.  Pinson provided Burton an initial installment payment of $25,000.  GSX 16.  In May, Burton and Pinson amended the agreement to provide Burton's car wash company with a purported "line of credit" through Pinson's two credit cards.  *See* GSX 15-2.  The amended agreement reflected the involvement of Robert Conley, a convicted felon.  *Id*.  Over the next several months, Burton incurred charges totaling nearly $35,000 on Pinson's credit cards.  *See* GSX 34.

Burton spent about half of the approximately $60,000 he obtained from Pinson (either in cash or through the use of the credit cards) on personal expenses, including rent on his Harborview apartment, home furnishings, restaurant meals, entertainment, gym fees, and a trip to Miami with his wife.  *See id.*  Despite Pinson's repeated requests, Burton failed to pay off the cards.  *See generally* GSX 17, 20-31.  He delayed Pinson by asking for the bills to be provided to him in a different format so that he could "divide Whaash Boston and Whaash Atlanta expenses," telling

him, "If I don't receive exactly what I am asking for, I will not and can not make any payments."

GSX 17.  He told Pinson, falsely, that the "cards will be paid on a monthly basis."  GSX 21.  In

November 2018, he agreed to pay Pinson $12,500 in cash, and another $5,000 before January 25,

2019, adding, "I gave you my word."  GSX 26.  In January 2019, he told Pinson that he was

"[g]etting the funds together."  GSX 27.  In February, he said, "As soon as the money is available

you will be paid."  GSX 28.  In March, he said he was "[w]orking on getting the money for the

cards."  GSX 29.[7]

Ultimately, Pinson filed a complaint with the Massachusetts Attorney General and the U.S.

Securities and Exchange Commission ("SEC").  Pinson later sought to withdraw the complaint

"[d]ue to personal issues," GSX 32, though he ultimately told the SEC that Burton had threatened

to "take the money I gave him to [sic] and have me killed.  He said some well known (hustler)

guys out of Harlem that he knows will hurt me if I don't sell them my shares of Whaash Atlanta."

GSX 33; *see also* GSX 23 (October 2018 Pinson email to Burton:  "You threaten to put a. Hit on

me because I want my money back you're a fraud.  [sic]  I will be hot very hot."; Burton response:

"Do you playboy!!").

    E.  <u>Burton's Association with Convicted Felons</u>

The investors in Burton's business were both convicted felons:  Pinson was convicted in

1997 of conspiracy to distribute heroin and related charges, and sentenced to 10 years in prison,

*see United States v. Pinson*, 95-cr-10099-WGY, Dkt. 602; Conley was convicted in 2014 of

---

[7] In an interview with the Securities and Exchange Commission in April 2019, Burton characterized the $25,000 he received from Pinson as a loan from Conley, and said that he had used the money for "vans, payroll, office expenses, computer, cell phone bills, equipment – everything to get the business going. Website, apps." *See* GSX 1-1 (audio recording of interview); GSX 1-2 (transcript of interview) at 5-6, 15-16.  Burton failed to note that he had spent much of the money on personal expenses.

conspiracy to distribute cocaine and related charges, and sentenced to 187 months in prison, a sentence that was later reduced to 168 months, *see United States v. Conley*, 12-cr-10227-RGS, Dkts. 259, 342.[8]

As noted, Burton's contacts with Pinson following his release from prison were extensive. So, too, were his contacts with Conley. *See, e.g.*, GSX 2-2t at 1 (Conley advising female: "You might can get some stock tips from Rob – 'cause I know he say, when he – *when he writes me*, he um, say he, indulge in it . . . and that's how he's been makin' some of his, his money.") (emphasis added); GSX 2-3t at 1 (female advising Conley that Burton was sending Conley books); GSX 3 (Conley email noting, "I got mail from Rob and pix's of his son").

Notably, the indirect nature and substance of Burton's communications with Conley— which continued well after these revocation proceedings were under way—make clear that the two men were aware that they were not supposed to be communication with each other.  For example, on June 30, 2020—the same day that Burton had his initial appearance in these proceedings, *see* Dkt. 235, Conley received an email at 2:21 p.m. advising him:  "R.B. went to court today I will keep you posted bro."  *See* GSX 8.  Conley responded at 3:44 p.m.:  "Please keep me post on the R/B front as well[.]  Benny is Fowl on that aspect. . . . I must cut bait with him dealing like that in the cipher."  *Id*.[9]  Later that day, at approximately 6:45 p.m., Conley called a female acquaintance to tell her that "Rob had to go to court because of Eddie Haskell today."  *See* GSX 2-4 (audio of call); GSX 2-4t at 2 (transcript).  The woman responded that Burton "called me today . . . to tell you . . . that you're probably gonna be called as a witness about Whaash."  *Id.*  Conley said:  "Tell

---

[8] Conley and Burton were housed together at FMC-Devens, and it was Conley who introduced Burton to Pinson.

[9] In various communications, Conley appears to have referred to Pinson, alternately, as "Benny" or "Eddie Haskell."

him . . . when you get a chance, I'm gonna just exercise my Fifth Amendment right and have nothing' to say." *Id.* at 3. *See also* GSX 2-7t at 1 (Conley advising male that "the lawyer said don't, um, don't even speak [to him] . . . until it's over"); GSX 4 (Conley email instructing Darlene Conley to "text Rob & let him know I'm gonna call tomorrow"); GSX 5 (Conley email instructing recipient Nicki Duncan to "text Rob and have him call u text our friend mike & have him check his email from me"); GSX 7 (Conley email instructing Duncan to "email R/B & ask him to have Mike/Mizz email me"; Duncan email responding that she "spoke to R/B he said he'll absolutely reach out to Mizz"); GSX 9 (Conley email instructing Duncan to "have our friend R/B get in touch with Mizz tell him to check his email from me!"); GSX 10 (email advising Conley: "I spoke to RB today and he said that RED will be called for a witness and that his lawyer told him that Benny wore a wire on him. Smh, this damn Benny. RB hates this guy . . . . So RB have a date on the 11th of next mth and then a resolution after the 24th of Sept.").

When the SEC interviewed Burton in April 2019, he acknowledged being in communication with Conley but declined to respond to questions about where Conley was located and how they communicated with each other. *See* GSX 1-2 at 6 (Q: "Do you have contact information for Mr. Conley?" A: "I do not." Q: "Oh, sorry, maybe I misunderstood. You don't know how to contact him?" A: "Oh, I can contact him, but I doubt he's going to want to – I'm not going to give that information to you."); *id*. at 18 (A: "And where is Mr. Conley located?" A: "I'd rather not say.").[10]

Burton also had contacts with two other felons who were incarcerated at the time: Russell Rose, who was convicted in 2002 of possession of cocaine with intent to distribute and sentenced

---

[10] Burton also told the SEC that Conley had invested $25,000 in his business "[t]hrough a family friend of his," but declined to provide Pinson's name when asked to identify the "family friend." *See* GSX 1-2 at 8 ("I'd rather not talk about that.").

to 100 months in prison, *see United States v. Rose*, 01-cr-10352-RGS, Dkt. 55, and again in 2013 of conspiracy to distribute cocaine and heroin, and sentenced to 300 months in prison, *see United States v. Rose*, 11-cr-10062-NMG, Dkt. 728; and Shaheen Curry, who was convicted in 2008 of conspiracy to distribute cocaine base and sentenced to 188 months in prison, *see United States v. Curry*, 19-cr-10130**,** Dkt. 1 (summarizing conviction and sentence), to whose prison commissary account Burton sent $50 in January 2019.  *See* GSX 13-1 (record of Burton payment to Rose commissary account); GSX 13-2 (list of email contacts between Burton and Rose between December 16, 2019 and January 31, 2020); GSX 14 (collection of Burton-Rose emails).

      F.   Burton's False Statements to Probation

Burton has repeatedly made false statements to various Probation Officers about, *inter alia*, the reasons for his relocations, his association with felons, and his payment of restitution.

On July 30, 2019, Burton advised Probation Officer Taia Thompson, by email, that he was "planning to move to Andover, MA from Somerville, MA on September 1st."  GSX 60.  He explained:  "We had the baby 6 months ago and have had some challenges adjusting to parenthood and the new edition [sic].  Tiesha's family and social circle are in Andover and can help with the baby while I work late and long hours."  *Id.* at 1.  On September 11, 2019, Burton advised Probation Officer Thompson that he and his wife had been "living apart and moved in together," and that "the Somerville space was not large enough for them and so they have moved to this current residence."  *Id.* at 2.  In fact, the July 30 and September 11 statements were untrue.  As noted above, Burton moved from his Somerville apartment because he failed to pay rent, and was evicted.

In addition, on each of his monthly supervision reports, Burton was asked whether he had had "any contact with anyone having a criminal record."  *See generally* GSX 62.  On each of the forms, Burton listed a single individual, Martin Corona.  *Id*.  Similarly, on March 30, 2020,

Probation Office Kaileen Paiva asked Burton "if he has had contact with any person convicted of a felony while on supervision." GSX 60 at 3. Burton "responded no," but "added that in his 'old business' he did not background check anyone he hired so it is unknown to him if anyone was a felony." *Id.*[11] He neglected to note that he had been in contact with Rose the prior day, and had sent money to Rose's prison commissary account. *See* GSX 14 at Bates number 4702 (March 29, 2020 email); Ex. G (Rose commissary records), attached hereto. In both the monthly supervision reports and in his statements to Probation Officer Paiva, Burton also failed to disclose that, as set forth above, he was in regular contact with Conley, Pinson, Rose and Curry, three of whom were in prison at the time of the contacts.

Finally, Burton misled the Probation Department about his payment of restitution and his ability to pay restitution. In October 2018, for example, Burton provided the Probation Department with a Net Worth Statement indicating that his salary and wages were approximately $5,000 per month. GSX 56 at 9. Burton certified, under penalty of perjury, that his answer were "true and correct." *Id.* at 13. In fact, however, Burton's 2018 tax returns reflect that he earned over $100,000 that year, most of it from his business. *See* GSX 54-1; 54-2.[12]

Likewise, Burton informed Probation Officer Tanasha Ward in January 2020 that he had dropped his restitution payment in the mailbox. *See* Ex. H (Jan. 10, 2020 chrono), attached hereto.

---

[11] Just 12 days later, Burton emailed Rose to say that he had written to the Warden at FMC Devens in support of Rose's motion for compassionate release. *See* GSX 14 at Bates number 4676 (April 12, 2020 email). According to Burton, he wrote: "I am the President of Whaash Corporation in Massachusetts. I want to advise you that if you decide to release Mr. Rose, upon his release and when the company presumes [sic] regular business operations, we will hire Mr. Rose as a technician for the company. Also, in the event, Mr. Rose needs housing, we will arrange housing for him before or upon his release." *Id.*

[12] Burton noted that his income "fluctuates based on business." GSX 56 at 10. He also indicating that his wife's gross wages were $7,500 per month, when in fact, they were closer to $5,250 based on her annual income of approximately $63,000.

In fact, however, the payment was never received, and Burton has not paid restitution since October 2019.  *See* GSX 53.[13]

Argument

A.  Applicable Law

Title 18, United States Code, Section 3583(e), provides that, where a defendant is found to have violated the conditions of his supervised release, the court may revoke the term of release and impose a sentence of incarceration.  In exercising its discretion to revoke a term of release, the court is required to consider the nature and circumstances of the offense, the history and characteristics of the offender, the need for adequate deterrence, the need to protect the public, and the penological needs of the offender, but "it need not do so mechanically."  *United States v. Vargas-Davila*, 649 F.3d 129, 131 (1st Cir. 2011) (further citations omitted).  Section 3583(e)(3) also "does not forbid consideration of other pertinent section 3553(a) factors," such as the need to promote respect for the law.  *Vargas-Davila*, 649 F.3d at 132; *see also United States v. DeArmas*, 556 F. App'x 854, 858 (11th Cir. 2014) (unreported) (affirming statutory maximum two-year term for violating conditions of release on defendant previously convicted of access device fraud and aggravated identity theft, where defendant again used fraudulent credit cards, noting "similarities between [defendant's] supervised release violations and his prior credit card fraud offenses"); *United States v. Cantey*, 486 F. App'x 305, 309 (3d Cir. 2012) (unreported) (affirming statutory maximum two-year term for violating conditions of release on defendant previously convicted of wire fraud, where court "focus[ed] on [defendant's] extensive criminal

---

[13] The Violation Report also contends that on September 25, 2018, Burton told Supervising Probation Officer Brett Wingard that he had paid half of the restitution he owed.  *See* Violation Report at 5.  Burton now contends that he was misunderstood, and that he was referring to his position that "he was only responsible for about half of the restitution as he had been arguing in his then pending 2255 Motion."  *See* Dkt. 280 at 12.

history and his rapid return to criminal activity following his release from prison"); *United States v. Growde*n, 663 F.3d 982, 985 (8th Cir. 2011) (affirming statutory maximum two-year term for violating conditions of release on defendant previously convicted of $400,000 wire fraud  based on "the number and seriousness of [defendant's] violations, his lack of remorse and refusal to take responsibility for his crimes or supervised release violations, his general disrespect for the law . . . his incredibl[y] dishonest character as evidenced by [his] repeated lies to court officers and third parties," and the need "to prevent the public from being swindled by him") (further citations and internal quotation marks omitted; second alteration in original).

> B.  The Section 3553 Factors Weigh in Favor of
> The Maximum Term of Incarceration

"It is said that past is prologue, and a sentencing court is entitled to give considerable weight to a defendant's failure to abide by the conditions of previous sentences." *Vargas-Davila*, 649 F.3d at 131 (citing William Shakespeare, *The Tempest* act 2, sc. 1 (1611)).  Here, Burton's persistence in committing various forms of fraud immediately upon his release from prison, his lack of remorse, refusal to take responsibility for his actions, and utter disdain for the law and the Court's supervision all counsel in favor of a meaningful term of incarceration.

> 1.  Nature and Circumstances of the Offense

The facts of Burton's offense are these:  he failed to pay restitution, despite pledging repeatedly to do so, while spending considerable sums of other people's money to support an extravagant lifestyle that he hid from the Court.

Even prior to his sentencing for his underlying crimes, Burton breached his plea agreement by failing to make a lump sum restitution payment of $50,000.  At sentencing he told the Court:

> The plea agreement I entered into, I didn't sign that haphazardly. I
> had signed that agreement with full intent of meeting my
> obligations.  You know, when you're dealing with sort of three and

> four serious civil matters and this criminal case, you're going to
> make some mistakes. You know, you're going to not ask for the
> right advice. You're going to be overwhelmed, you know.  And I
> made those mistakes, and I want to take full responsibility for it.

Dkt. 173 at 37.  Burton went on to ask the Court for mercy, pledging to work hard to use his

freedom to pay restitution to his victims.  He said:  "Any leniency that you can give me, Your

Honor, it won't be for me, per se.  It would be for me to quickly obtain employment, run my

business, make money and pay these individuals back."  Dkt. 173 at 37.

At the time, the Court doubted Burton's sincerity, noting:  "I don't believe that if you were

out that you would work industriously to pay back [your victims]. . . .  I know they would like their

money back, but letting you out in my judgment would not result in that."  *Id*. at 43.  And the Court

was right.  No sooner had he been sentenced, then Burton again failed to make the $50,000 lump

sum payment the Court ordered him to make by January 19, 2015.  Dkt. No. 125.

Burton's dishonesty and defiance have continued since his release from prison.  He earned

more than $100,000 in the first year after his release, and nearly $70,000 in the year after that, all

while residing with his wife, who earned more than $60,000 annually.   Yet despite that

considerable income, Burton has paid barely $3,300 in restitution to his victims, and the IRS has

effectively given up on collecting the back taxes he owes.

Instead, Burton spent money on himself.  He rented a two-bedroom penthouse apartment

on the waterfront.  He spent lavishly on restaurant meals.  He took a vacation to Miami with his

wife.  To pay for these luxuries, he used other people's money—money that was ostensibly

intended to fund his start-up business.  And he did so in what he now effectively concedes was an

effort to evade Court scrutiny, telling the Court in connection with this proceeding that—because

he structured Pinson's investment and the use of his credit cards as a purported business deal, in

the name of his corporate alter ego—"these are corporate not personal debts," and he "was not required to seek approval from U.S. Probation in advance." Dkt. 280 at 5.

In short, Burton's failure to pay restitution is not the result of his honest inability to pay a debt he cannot afford despite working hard to make things right. It is, instead, the product of his deliberate and sustained effort to defraud his victims, and the Court, all over again.

2. <u>Burton's History and Characteristics</u>

At Burton's prior sentencing, the Court described him as "an eloquent, thorough fraud" who targeted "vulnerable people who genuinely cared for you and who you knew really needed the money that you were taking from them." Dkt. 173 at 40-41. Burton has not changed in the ensuing six years.

He is a consummate con man. He lied about his income on three successive apartment rental applications, submitted falsified pay stubs in support of at least one of them, and lied in one about his criminal history. He rented apartments despite having no prospect of paying for them, plainly intending to stay as long as he could until he found his next victim. He said he had paid the rent when he hadn't. He refused to pay on the basis that his heat purportedly wasn't working, then refused repairmen access to "fix" the alleged problem, even as he filed complaints with the City of Boston and the courts. He even succeeded in extorting money from one landlord to move from the apartment for which he hadn't paid rent in months.

He likewise lied to his purported business partners. He persuaded Pinson to invest tens of thousands of dollars in his company, then used much of the money for personal purposes. He stalled for time, falsely promising to pay the credit card bills he owed, or claiming that he had already paid those bills. And when lies didn't work, he once again resorted to threats—this time, of physical violence.

16

Burton has also lied to the Court and to Probation.  He claimed his restitution check was in the mail.  It wasn't.  He misled Probation about his ability to pay restitution.  He said he had moved apartments for personal reasons, when in fact he had been evicted.  He falsely denied having contact with convicted felons—and more recently has invented excuses for why he thought the contacts he denied having were actually allowed.[14]

The pattern is clear.  Burton, as the Court has previously noted, is well educated, having graduated from both college and law school.  Dkt. 173 at 41-42.  His choice to resort, again and again, to fraud and deceit is motivated not by addiction or need, not by an inability to work honestly, but simply by selfishness and greed.  *See id*. ("You evidently have the energy and intelligence to work honestly.  You just chose not to.").

### 3.   The Need for Adequate Deterrence and to Protect the Public

There is, concededly, little prospect that a two-year term of incarceration will be more effective at deterring Burton from committing crime than a four-year sentence was, though perhaps the additional time will cement the message the prior sentence did not:  "that when you commit crimes, when you continuously lie to people, including judges, you're not going to get away with it.  There are going to be serious consequences."  *Id*. at 42.  Likewise, the need for general deterrence counsels in favor of a meaningful sentence.  Once again, as the Court noted:  "The message that you and others should get is that [fraud is]  not just wrong; it's dumb.  You'll get caught.  You'll get convicted.  You'll get a serious punishment."  *Id.*

---

[14] Burton lied to those convicts—his purported friends—as well.  On March 17, 2020, he emailed Rose, "Buying a new house soon.  6 bed, 7 bath $1.9m in Andover.  Will send you pics." GSX 14 at Bates number 4792.  Burton was collecting unemployment at the time.  *See* DSX 100 (notification of unemployment benefits).  The following day, he was notified by the IRS that it was temporarily closing its collection case against him based on his inability to pay.  *See* Dkt. 303, Ex. A.

Prison will also protect the public from Burton's crimes.  While he was incarcerated, Burton was unable to steal.  As long as he is free, he is likely to continue to defraud others.  As the Court noted in sentencing him the last time:  "I'm deeply concerned that if I in essence released you now . . . you would be dangerous.  If you needed money, you'd commit more crimes to get it, whether to pay the victims in this case or more likely to live more comfortably yourself."  *Id*. at 42-43.  That conclusion is even more demonstrably true today.  As Burton's actions make clear, given the chance, he will find his way around conditions of release.  He will hide his actions from Probation and the Court.  He will lie to cover his tracks, or invent clever, legalistic excuses when he gets caught.  Only prison will stop him.

4.  Other Factors

There are few, if any, mitigating factors that counsel in favor of leniency.  Burton has a small child, but that is not a reason to let him escape responsibility for his actions, and his wife is, in any event, gainfully employed and able to care for the child.  Burton has elderly parents, but they reside elsewhere, and Burton is not their primary caregiver.  Burton is not currently employed, but even if he were, he has demonstrated that he will use whatever means are at his disposal to avoid paying restitution to his victims.

Conclusion

In sentencing Burton six years ago, the Court expressed concern that its above-Guidelines sentence of four years in prison—nearly a year beyond what the government had requested—would be insufficient to serve the statutory purposes of sentencing.  Unfortunately, Burton's actions have validated that concern, making clear that he is an unrepentant recidivist.  For that reason, and the other reasons set forth above and in the government's prior briefing, the government respectfully recommends that the Court impose a term of imprisonment of two years, to be followed by one year of supervised release.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  */s/ Stephen E. Frank*
Stephen E. Frank
Dated: October 8, 2020                   Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I certify that on October 8, 2020, this document was filed through the ECF system, which will provide electronic notice to counsel as identified on the Notice of Electronic Filing.

*/s/ Stephen E. Frank*
STEPHEN E. FRANK